101 A.3d 736

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Michelle Sue THARP, Appellant.**

Supreme Court of Pennsylvania.

Submitted March 6, 2013.

Decided Sept. 24, 2014.

674

676

680

Angela S. Elleman, Esq., Federal Community Defender Office, Eastern District of PA, Elizabeth Hadaiya, Esq., James Joseph McHugh Jr., Esq., Defender Association of Philadelphia, for Michelle Sue Tharp.

Jerome Anthony Moschetta, Esq., Washington County District Attorney's Office, Amy Zapp, Esq., PA Office of Attorney General, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, STEVENS, JJ.

## OPINION

Justice BAER.

On November 14, 2000, Appellant Michelle Sue Tharp was convicted of first degree murder and related offenses after she deliberately starved her seven-year-old daughter to death. After her judgment of sentence was affirmed on appeal, Appellant filed a petition pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541–46. Following several evidentiary hearings, the Washington County Common Pleas Court ("PCRA court") dismissed Appellant's petition. For the reasons set forth herein, we affirm the PCRA court's denial of relief on Appellant's guilt phase claims, and reverse the PCRA court's denial of relief on the claim that trial counsel was ineffective for failing to present mental health mitigation evidence during the penalty phase of trial.[1] Accordingly, we remand for a new penalty hearing.

Evidence presented at Appellant's murder trial established that she was the mother of the victim in this case, Tausha Lee Lanham. Appellant gave birth to Tausha prematurely on August 16, 1990, and, due to health consequences stemming from her premature birth, Tausha spent the first year of her life hospitalized. Tausha was the second born of Appellant's four children, and was the sole target of Appellant's severe neglect and abuse. Appellant did not mistreat or neglect her other children, who were all healthy and well-fed. In 1996, Appellant began living with Douglas Bittinger, Sr., with whom Appellant had her fourth child.

Pursuant to Appellant's direction, the family would eat dinner while Tausha was either kept in the pantry or trapped in a corner of the kitchen by pieces of furniture. Appellant further instructed Bittinger not to feed Tausha while Appellant was away from the apartment. Accordingly, on multiple occasions, two or three days would pass without Tausha getting any food or drink. This led her to sneak and eat cake mix or dog food from the pantry, eat bread thrown outside for

1. This Court has exclusive jurisdiction to review a final order denying relief in a capital case. 42 Pa.C.S. § 9546(d).

birds, eat from the garbage, and drink from the toilet. Appellant also strapped Tausha to the toilet for extended periods of time to "potty-train" her. Additionally, notwithstanding that Tausha suffered from several infirmities due to her premature birth, in the years preceding her death, Appellant did not seek any medical care for Tausha.

Remarkably, several individuals in addition to Douglas Bittinger observed Appellant's abuse and neglect of Tausha, but apparently could not rescue the child from her mother's torment. Bittinger's sister-in-law, Audrey Bittinger, lived in the apartment above Appellant's residence, and observed the aforementioned abuse. She reported the matter to the Washington County Children and Youth Services ("CYS"), and a caseworker made at least five attempts to visit Tausha. However, Appellant removed Tausha from the apartment on each occasion.

Appellant's neighbor, Lisa Camp, witnessed Tausha eating "toy food," cat food, and dog food. She further saw Appellant withhold food from Tausha, and described the child as weak and frail a few months before she died. When Camp asked Appellant about Tausha's condition three weeks before the child's death, Appellant responded that Tausha "belonged six feet under in a body bag." Tausha's aunt, Rhonda Lanham, who lived with Appellant and her children for several months, also documented the deplorable abuse that Tausha suffered at the hands of her mother. Lanham had such concern over Appellant's treatment of Tausha that she offered to take the child to live with her, but Appellant refused. Finally, Carrie Tharp, Appellant's step-mother, was a witness to Appellant's abuse of Tausha. After one occasion where Tharp cared for Tausha and fed her, Appellant refused to let Tharp see the child again. Tharp made 25 calls to CYS to report the abuse from 1996 until Tausha's death in 1998.

On the morning of April 18, 1998, Appellant returned home and found seven-year-old Tausha dead in her bed. Bittinger returned to the apartment shortly thereafter, and told Appellant to call 911. Appellant refused, indicating that she was afraid that CYS would take away her other children. Appel-

lant and Bittinger thereafter placed Tausha's body in a car seat in their car, along with the rest of their children, and proceeded to run errands. They ultimately drove to Empire, Ohio, where Appellant and Bittinger purchased garbage bags to dispose of the child's body. Appellant and Bittinger proceeded to Follansbee, West Virginia, where they discarded Tausha's body in garbage bags on the side of the road.

Appellant and Bittinger thereafter returned to a mall in Ohio, shopped for a while, and then reported to mall security that Tausha had been abducted. When questioned by police, both Bittinger and Appellant ultimately confessed that Tausha had died and that they had hidden her body. Bittinger led police to the location where Tausha's body was recovered. An autopsy revealed that Tausha, at seven years of age, weighed only 11.77 pounds and was 31 inches tall. The medical examiner concluded that Tausha had not eaten for several days, that the cause of death was malnutrition due to starvation, and that the manner of death was homicide. The medical examiner based his opinion on the fact that Tausha's body demonstrated various indicators of malnutrition, including no fat at all in parts of the body where fatty tissue normally accumulates, and extreme wear on the grinding surface of Tausha's teeth, which is common in juvenile starvation cases.

Appellant and Bittinger were thereafter charged with criminal homicide and related offenses. Approximately one week prior to the commencement of jury selection, the two defendants filed requests to waive their right to a jury trial. In response, the Commonwealth requested a jury trial pursuant to the 1998 amendment to Article I, Section 6 of the Pennsylvania Constitution.[2] The trial court granted the Commonwealth's request. Appellant and Bittinger appealed to this Court, which affirmed the trial court's order. *Commonwealth v. Tharp*, 562 Pa. 231, 754 A.2d 1251 (2000) (rejecting the constitutional challenge to the 1998 amendment to Article I,

2. This provision states that "in criminal cases, the Commonwealth shall have the same right to trial by jury as does the accused." PA. CONST. ART. I, § 6.

Section 6, and holding that there was no impediment to applying the amendment to the facts presented).

Upon remand to the trial court, Appellant's case was severed from Bittinger's, and a jury trial was conducted. To establish that Appellant deliberately withheld food from Tausha with the intent to starve her to death, the Commonwealth presented the testimony of several witnesses who had each independently observed Appellant repeatedly deny Tausha food. These witnesses included Douglas Bittinger, Audrey Bittinger, Rhonda Lanham, Carrie Tharp, and Lisa Camp. Additionally, three inmates who had been incarcerated with Appellant after her arrest testified that Appellant was not sorry Tausha had died. Specifically, inmate Juanita Donnelly testified that Appellant told her that she withheld food from Tausha because Tausha was mentally retarded. Inmate Dena Chandler testified that when she asked how Appellant could have committed the offense, Appellant responded that she never loved Tausha and that Tausha interfered with her life. Further, inmate Renee Vogel testified that Appellant told her that she was glad her "little retarded baby" had died. Finally, the medical examiner testified as to the basis for his conclusion that Tausha died as a result of malnutrition due to starvation, and opined that the manner of her death was homicide.

Appellant testified on her own behalf at trial. Her defense was that Tausha suffered from the preexisting medical condition known as "failure to thrive," and that such condition caused Tausha's deteriorative physical state and, ultimately, her death. Appellant further testified that she had been a victim of physical and emotional abuse at the hands of her own parents, step-parents, and previous boyfriends, including the fathers of her children, who gave her no support in raising the family. Appellant explained that she had felt overwhelmed by the burden of child rearing and may not have been a good mother to Tausha, but that she did not starve her own child to death.

On November 13, 2000, the jury convicted Appellant of first degree murder, endangering the welfare of a child, and abuse

of corpse. During the penalty phase of trial, the defense incorporated the guilt phase evidence and presented no other witnesses or documentary evidence in mitigation, with the exception of a stipulation that Appellant had no prior criminal history. Following the penalty hearing, the jury found one aggravating circumstance, that the victim was less than twelve years of age, 42 Pa.C.S. § 9711(d)(16), and two mitigating circumstances, that Appellant had no significant history of prior criminal convictions, *id.* § 9711(e)(1), and the "catchall mitigator" of any other evidence of mitigation concerning the character and record of Appellant and the circumstances of her offense. *Id.* § 9711(e)(8).[3] Finding that the aggravating circumstance outweighed the two mitigating circumstances, the jury returned a verdict of death. Accordingly, the trial court sentenced Appellant to death for the murder conviction and to a consecutive sentence of one to two years of imprisonment on the charge of abuse of corpse.[4]

The trial court denied Appellant's post-trial motions. In her direct appeal to this Court, Appellant challenged the weight and sufficiency of the evidence, and alleged that the trial court erred by denying her motion for change of venue. Appellant also contended that the trial court erred by admitting photographs of the victim, by failing to declare a mistrial after jurors overheard a witness's comments, and by failing to

**3.** In an issue that we need not address due to our grant of a new penalty hearing, Appellant contends that the jury did not find the mitigating circumstance that she lacked a significant history of prior criminal convictions, as stipulated by the parties. For purposes of discussion, however, we presume that the jury found this mitigating circumstance, which presumption is supported by this Court's opinion on direct appeal. *See Commonwealth v. Tharp*, 574 Pa. 202, 830 A.2d 519, 523 (2003) (stating that "[t]he jury also found two mitigating circumstances: that appellant had no significant history of prior criminal convictions, and the 'catchall mitigator,' *i.e.*, any other evidence of mitigation concerning the character and record of appellant and the circumstances of her offense") (citations and footnotes omitted). Our presumption in this regard, notwithstanding Appellant's argument that the jury failed to find this mitigating circumstance, in no way negatively affects Appellant given our ultimate disposition that a new penalty hearing is warranted.

**4.** No additional sentence was imposed for the endangering the welfare of a child conviction.

recuse. This Court rejected all of Appellant's contentions, and affirmed her judgment of sentence. *Commonwealth v. Tharp,* 574 Pa. 202, 830 A.2d 519 (2003). We stated:

> We recognize that this case is unusual in that death was not brought about by a single act. Rather, the evidence showed a course of conduct over a 7–year period of time. The perhaps-unusual facts, however, do not change the ample evidence of appellant's hardness of heart. They do not change the evidence of a seven-year-old's starvation death at the deliberate hand of her own mother. Indeed, the very length of time needed to bring about Tausha's death by starvation suggests a unique type of coldness and delibera-tion, for within that time there was ample opportunity for reflection, for reconsideration, and for the development of a tinge of sympathy for the child. That appellant still pro-ceeded in her course reveals the sort of premeditation and deliberation that separates first degree murder from other killings or, at least, the jury could so find.

*Id.* at 527. The United States Supreme Court thereafter denied Appellant's petition for certiorari. *Tharp v. Pennsyl-vania,* 541 U.S. 1045, 124 S.Ct. 2161, 158 L.Ed.2d 736 (2004).

On May 3, 2005, Appellant filed a timely PCRA petition, raising approximately thirty issues. Appellant subsequently filed four supplements to the petition. The PCRA court conducted an evidentiary hearing on April 26 and 27, 2010, and Appellant presented several witnesses in support of both her guilt and penalty phase issues. After Appellant's evidence was presented, the PCRA court recessed the hearing to afford the Commonwealth an opportunity to prepare witnesses to respond to Appellant's claims. The evidentiary hearing re-sumed on January 4, 2011, and both parties were permitted to file additional legal memoranda in support of their arguments by June 20, 2011.[5]

---

5. Appellant subsequently filed a motion to remand to the trial court for correction of errors appearing in the record on appeal. On July 3, 2012, this Court remanded the matter to the PCRA court to consider if Appellant timely filed objections to the transcript under Pa.R.A.P. 1922(a). We further directed the PCRA court to determine whether current counsel, the Federal Community Defender Organization, may

The PCRA court noted in its opinion that it had considered Appellant's lengthy original PCRA petition, her four supplements thereto, thousands of pages of appendices and exhibits, and Appellant's 160–page post-hearing memorandum. *Commonwealth v. Tharp*, Docket No. 1494–1998, *slip op.* at 45 (CP Washington, Aug. 31, 2011) (hereinafter, "PCRA Ct. Op.").[6] The court concluded that several of Appellant's issues had been previously litigated, and that various other issues of ineffective assistance of counsel were waived for lack of development. The PCRA court further addressed thoroughly the merits of the remaining issues, which analysis is set forth in detail, *infra,* to the extent it is relevant to the claims raised herein.

■ In this direct appeal from the denial of PCRA relief, Appellant raises ten issues.[7] In reviewing the denial of PCRA relief, we examine whether the PCRA court's determination "is supported by the record and free of legal error." *Commonwealth v. Sepulveda*, 618 Pa. 262, 55 A.3d 1108, 1117 (2012) (citing *Commonwealth v. Rainey*, 593 Pa. 67, 928 A.2d 215, 223 (2007)). The PCRA provides that to be entitled to relief, a petitioner must establish, by a preponderance of the evidence, that his conviction or sentence resulted from one or more of the enumerated errors in Section 9543(a)(2), and his claims have not been previously litigated or waived. 42 Pa. C.S. § 9543(a)(2).[8] An issue is previously litigated if "the

lawfully represent Appellant in this state capital proceeding. On August 15, 2012, the PCRA court granted in part Appellant's motion to correct the record, and concluded that current counsel is lawfully representing Appellant on a *pro bono* basis. The Commonwealth does not challenge the propriety of the PCRA court's rulings in that regard.

6. Acknowledging the extraordinary amount of judicial resources it expended to adjudicate Appellant's PCRA petition, the PCRA court opined that the defense's goal in representing Appellant extended beyond zealous representation, and was intended to delay the proceedings to prevent Appellant from being executed. *Id.*

7. The issues have been reordered for purposes of clarity.

8. This section provides:

highest appellate court in which [the appellant] could have had review as a matter of right has ruled on the merits of the issue." *Id.* § 9544(a)(2). An issue is waived if the appellant "could have raised it but failed to do so before trial, at trial, ... on appeal or in a prior state postconviction proceeding." *Id.* § 9544(b).

■■■ To prevail on a claim of ineffective assistance of counsel, a PCRA petitioner must satisfy the performance and prejudice test set forth in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Sepulveda,* 55 A.3d at 1117. This Court has described the *Strickland* standard as tripartite by dividing the performance element into two distinct components. *Commonwealth v. Busanet,* 618 Pa. 1, 54 A.3d 35, 45 (2012); *Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973, 975 (1987). Accordingly, to prove counsel ineffective, the petitioner must demonstrate: (1) the underlying claim has arguable merit; (2) no reasonable basis existed

(a) General rule.—To be eligible for relief under this subchapter, the petitioner must plead and prove by a preponderance of the evidence all of the following:

\* \* \*

(2) That the conviction or sentence resulted from one or more of the following:

(i) A violation of the Constitution of this Commonwealth or the Constitution or laws of the United States which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

(ii) Ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

(iii) A plea of guilty unlawfully induced where the circumstances make it likely that the inducement caused the petitioner to plead guilty and the petitioner is innocent.

(iv) The improper obstruction by government officials of the petitioner's right of appeal where a meritorious appealable issue existed and was properly preserved in the trial court.

(v) Deleted.

(vi) The unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced.

(vii) The imposition of a sentence greater than the lawful maximum.

(viii) A proceeding in a tribunal without jurisdiction.

42 Pa.C.S. § 9543(a)(2).

for counsel's actions or failure to act; and (3) the petitioner suffered prejudice as a result of counsel's error such that there is a reasonable probability that the result of the proceeding would have been different absent such error. *Sepulveda*, 55 A.3d at 1117 (citing *Pierce*, 527 A.2d at 975). Counsel is presumed to have rendered effective assistance. *Sepulveda*, 55 A.3d at 1117.

A court is not required to analyze the elements of an ineffectiveness claim in any particular order of priority; instead, if a claim fails under any necessary element of the ineffectiveness test, the court may proceed to that element first. *Id.* at 1117–18; *Commonwealth v. Albrecht*, 554 Pa. 31, 720 A.2d 693, 701 (1998). Finally, counsel cannot be deemed ineffective for failing to raise a meritless claim. *Commonwealth v. Jones*, 590 Pa. 202, 912 A.2d 268, 278 (2006).

## Guilt Phase Issues

### I. *Brady* claim

Appellant contends that the Commonwealth violated its obligations under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose extensive exculpatory and impeachment evidence. Before considering the particular items of allegedly withheld evidence, we review the relevant law. In *Brady*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.*, 373 U.S. at 87, 83 S.Ct. 1194. This Court has held that "[t]o prove a *Brady* violation, the defendant must show that: (1) the prosecutor has suppressed evidence; (2) the evidence, whether exculpatory or impeaching, is helpful to the defendant; and (3) the suppression prejudiced the defendant." *Commonwealth v. Busanet*, 618 Pa. 1, 54 A.3d at 48 (citing *Commonwealth v. Pagan*, 597 Pa. 69, 950 A.2d 270, 291 (2008)).

 To obtain a new trial based on the Commonwealth's failure to disclose evidence affecting a witness's credibility, the defendant must demonstrate that the reliability of the witness may be determinative of the defendant's guilt or innocence. *Commonwealth v. Weiss*, 604 Pa. 573, 986 A.2d 808, 815 (2009); *Commonwealth v. Johnson*, 556 Pa. 216, 727 A.2d 1089, 1094 (1999). Additionally, "[t]o satisfy the prejudice inquiry, the evidence suppressed must have been material to guilt or punishment." *Commonwealth v. Ly*, 602 Pa. 268, 980 A.2d 61, 76 (2009) (citing *Commonwealth v. Gibson*, 597 Pa. 402, 951 A.2d 1110, 1126–1127 (2008)). "[F]avorable evidence is material and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433–34, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (internal quotation marks omitted). In determining if a reasonable probability of a different outcome has been demonstrated, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Weiss*, 986 A.2d at 815 (quoting *Kyles*, 514 U.S. at 434, 115 S.Ct. 1555). Keeping in mind this jurisprudence, we proceed to review the categories of allegedly withheld evidence.

## A. Douglas Bittinger

The primary thrust of Appellant's *Brady* claim concerns evidence allegedly withheld that could have been used to impeach the testimony of Douglas Bittinger, the Commonwealth witness who was also charged with first degree murder in connection with Tausha's death, and likewise faced the death penalty.

Appellant argues that the Commonwealth failed to disclose that it had entered into an oral plea agreement in exchange for Bittinger's testimony against Appellant. Relying on the PCRA evidentiary hearing testimony of Bittinger's attorney,

Michael Savona, Esquire, Appellant asserts that the Commonwealth orally agreed that if Bittinger testified against Appellant, the Commonwealth would allow Bittinger to plead guilty to general homicide, not exceeding murder of the third degree, would drop Bittinger's aggravated assault charge, and would recommend that his remaining sentences run concurrently. *See* Notes of Testimony ("N.T."), Apr. 26, 2010, at 149.[9] Appellant acknowledges that, at her trial, Bittinger testified that no promises had been made to him in return for his testimony, and that, despite facing the death penalty, he was testifying out of the goodness of his heart, expecting nothing in return. N.T., Nov. 8, 2000, at 429, 468–69. Appellant argues, however, that Bittinger's testimony in this regard was false, and that the prosecution was aware of its falsity, and did nothing to correct it.

Appellant further argues that the Commonwealth failed to disclose a letter Bittinger sent to the District Attorney, indicating he would only testify against Appellant if he received some benefit for doing so. Finally, Appellant contends the Commonwealth failed to disclose a mental health evaluation of Bittinger given to the prosecutor by Attorney Savona prior to Appellant's trial, establishing that Bittinger suffered from a cognitive disorder, emotional disturbances, and mild mental retardation, as evidenced by an IQ of 62. *See* Appellant's PCRA Exhibit 102, Psychological Evaluation of Bittinger conducted by Paul M. Bernstein, Ph.D. The evaluation also noted that Bittinger denied that Tausha had ever been starved.

The Commonwealth responds that the PCRA court's factual determination that no promise of leniency was made to Bit-

9. Appellant further contends that the Commonwealth abided by this agreement. At Bittinger's guilty plea proceeding, held two months after Appellant was convicted of the instant murder, the parties presented to the court a plea agreement whereby Bittinger pled guilty to a general charge of murder, endangering the welfare of a child, and abuse of corpse, and the Commonwealth agreed to cap the degree of guilt at third degree murder, *nolle pros* the aggravated assault charge, and have the remaining sentences run concurrent to the sentence imposed for murder. The trial court accepted Bittinger's plea, and, following a degree of guilt hearing, convicted him of third degree murder, sentenced him to 15–30 years of imprisonment, and imposed concurrent sentences on the remaining charges.

tinger is supported by the record, and should not be disturbed. Moreover, it maintains, Attorney Savona's PCRA hearing testimony that an agreement existed contradicts his previous testimony, given ten years earlier at Appellant's trial, that there was no agreement reached regarding considerations given to Bittinger in exchange for his testimony against Appellant. N.T., Nov. 8, 2000, at 396 (where, immediately prior to Bittinger taking the witness stand at Appellant's trial, Attorney Savona informed the trial court that there was no concrete deal between Bittinger and the Commonwealth).

The Commonwealth further argues that, even if there had been an agreement between the government and Bittinger, no prejudice resulted from its nondisclosure because ample evidence existed, independent of Bittinger's testimony, from which the jury could conclude that Appellant murdered her child. The Commonwealth cites testimony from several witnesses who corroborated Bittinger's testimony that Appellant went to great lengths to withhold food from Tausha when there was ample food for her other children, and the medical examiner's conclusion, based on the performance of an autopsy, that Tausha had not eaten for several days and that her death resulted from severe malnutrition brought about by starvation. Finally, the Commonwealth emphasizes that the jury was made aware of the potential biases Bittinger held in favor of the Commonwealth and the trial court instructed the jury to scrutinize carefully Bittinger's credibility because, as an accomplice, he may have testified falsely in the hope of obtaining favorable treatment.

The PCRA court rejected Appellant's claim, finding that the District Attorney consistently indicated prior to Appellant's trial, during Appellant's trial, and at Bittinger's sentencing, that no formal or informal deal had been reached with Bittinger before he testified against Appellant. PCRA Court Opinion at 35.[10] Thus, the court found, contrary to Appellant's contentions, Bittinger was not promised leniency in exchange for his

10. The District Attorney did not testify at the PCRA hearing. Appellant informs us that the District Attorney was deceased at that time. Reply Brief of Appellant at 2, n. 1.

testimony. The PCRA court further held that even if the Commonwealth had suppressed a deal for leniency in exchange for testimony or suppressed the letter indicating Bittinger's desire to obtain a benefit from his testimony, disclosure of the same would not have changed the outcome of Appellant's trial, considering the substantial evidence of her guilt. *Id.* at 38.[11] The court emphasized that defense counsel thoroughly cross-examined Bittinger about his interests in testifying against Appellant, and suggested to the jury that Bittinger was testifying in exchange for a lesser sentence. Accordingly, the PCRA court held that Appellant's *Brady* issue relative to Bittinger fails.

 Upon review, we conclude that the PCRA court's factual findings are supported by the record and its conclusions of law are free from legal error. The record supports the PCRA court's finding that Bittinger was not promised leniency in exchange for his testimony against Appellant. N.T., Nov. 8, 2000, at 394–95 (where the District Attorney indicates that there was no agreement promising Bittinger leniency in exchange for Bittinger's testimony against Appellant); *id.* at 469 (where Bittinger testifies that he does not expect anything in return for his testimony). Notwithstanding that other evidence presented at the PCRA evidentiary hearing suggested that an oral agreement may have been reached, the record supports the PCRA court's factual finding that no undisclosed agreement existed, which was suppressed by the Commonwealth. *See Commonwealth v. Busanet,* 54 A.3d at 48 (affirming the PCRA court's denial of relief on a *Brady* claim where the record supported the PCRA court's finding that no undisclosed deal between the Commonwealth existed); *Commonwealth v. Koehler,* 614 Pa. 159, 36 A.3d 121, 135 (2012) (same).

Moreover, we conclude that even if a deal existed between the government and Bittinger, Appellant was not prejudiced by the Commonwealth's nondisclosure. First, as recognized by the Commonwealth, the jury was made aware during

11. The PCRA court did not specifically address the alleged suppression of Bittinger's medical evaluation.

Bittinger's testimony that he was also charged with the first degree murder of Tausha, and similarly faced the death penalty. N.T., Nov. 8, 2000, at 431, 469–70. During closing arguments, defense counsel emphasized that Bittinger's testimony should be viewed with caution because he was also charged in connection with the crime. N.T., Nov. 13, 2000, at 907 (stating, "Mr. Bittinger is also charged in this case, and the Court will instruct you that because Bittinger is charged, you can take that fact into consideration, and the Court will give you a specific instruction, but that goes to his credibility"); id. at 908 (stating, "Is Mr. Bittinger trying to make the situation look far worse than it ever was for his own gain and benefit?"). Finally, the trial court specifically instructed the jury that because Bittinger was an accomplice to the murder, he may testify falsely in the hope of obtaining favorable treatment. Id. at 954. The court explained that Bittinger's testimony must be considered by special rules applicable to accomplices, including that the jury should view accomplice testimony with disfavor because it is from a corrupt and polluted source; that an accomplice's testimony should be examined closely and only accepted with care and caution; and that the jury should consider whether the accomplice's testimony is supported by other evidence. Id. at 955.

Second, even setting aside Bittinger's testimony, there was overwhelming evidence of Appellant's guilt. As cogently noted by the Commonwealth, the testimony of Appellant's own friends, neighbors, and relatives established that she deliberately starved her daughter to death, not only by denying meals, but by physically restraining the child so that she could not feed herself. The evidence demonstrated that, remarkably, Appellant asked others to perpetuate the same abuse upon her own child. Appellant also expended much effort to avoid the assistance of those able to help the child, including the Washington County CYS. Finally, the testimony of the medical examiner established that Tausha had not eaten for several days before her death, that she weighed less than twelve pounds at seven years of age, and that her cause of death was malnutrition as a result of starvation.

Considering that the jury was well aware that Bittinger had a motive to lie, and that there was overwhelming evidence of Appellant's guilt absent Bittinger's testimony, we conclude that Appellant was not prejudiced by any undisclosed deal, by a letter sent by Bittinger seeking leniency, or by a mental health evaluation suggesting that Bittinger may have been cognitively or emotionally impaired. We conclude that the absence of the allegedly suppressed evidence did not deny Appellant a fair trial or result in a verdict that was not worthy of confidence. *See Weiss*, 986 A.2d at 816. Accordingly, the requisite prejudice for a *Brady* claim is lacking.

### B. Inmate Testimony

Appellant next contends that the Commonwealth suppressed information that could have been used to impeach the credibility of Juanita Donnelly, Dena Chandler, and Renee Vogel, who were incarcerated with Appellant and testified against her at trial. Each of these witnesses testified that Appellant had made comments while in prison indicating that she never loved Tausha, and was glad that the child had died.[12]

As to the alleged *Brady* violation with respect to Donnelly, Appellant contends the Commonwealth suppressed a letter Donnelly sent to the District Attorney, seeking an early parole in exchange for her testimony, and Donnelly's hospital records detailing that she suffered from mental health conditions that impaired her memory. Appellant also submits the Commonwealth failed to disclose that Donnelly was testifying under the threat of contempt and that she had a prior *crimen falsi* conviction. Regarding Chandler, Appellant asserts that the Commonwealth suppressed Chandler's criminal record for *cri-*

12. As noted, Juanita Donnelly testified that while she was incarcerated with Appellant at the Washington County Correctional Facility, Appellant told her that she withheld food from Tausha because she was mentally retarded, N.T., Nov. 8, 2000, at 538, and that she would tie Tausha to the toilet to potty-train her. *Id.* Dena Chandler testified that while residing in the same pod of the jail as Appellant, Chandler asked Appellant, "How could you do that?" *Id.* at 508. According to Chandler, Appellant responded, "Easily. I never loved her. She interfered with my life." *Id.* Renee Vogel testified that while incarcerated with Appellant, Appellant stated, "I'm glad the little retarded baby is dead." *Id.* at 487.

*men falsi* offenses, and a pre-sentence report that acknowledged her drug addiction and untrustworthiness. Finally, as to Vogel, Appellant asserts the Commonwealth suppressed Vogel's mental health records, prior criminal record, and the alleged "fact" that the District Attorney offered Vogel early parole in exchange for her testimony against Appellant.

The Commonwealth submits that the PCRA court properly denied relief on these claims. It reiterates that the record supports the court's finding that Appellant failed to prove the existence of any agreement, deal or favorable treatment in exchange for the inmates' testimony. Any parole that may have been granted to the inmates, the Commonwealth submits, would have been a matter of public record, readily obtainable by the defense from non-governmental sources. *See Commonwealth v. Lambert*, 584 Pa. 461, 884 A.2d 848, 856 (2005) (finding no *Brady* violation where the defendant knew, or with reasonable diligence, could have uncovered the evidence allegedly suppressed). Moreover, the Commonwealth reiterates the PCRA court's conclusion that any suppression of the alleged evidence was not outcome determinative because trial counsel called several witnesses to discredit the inmates' testimony.

The PCRA court denied relief on these *Brady* claims. Initially, the court found that those claims relating to the suppression of criminal records failed as such documents constitute public records. Similarly, the court found that claims relating to the suppression of hospital records were meritless because those documents could have presumably been obtained by subpoena from non-governmental sources. The PCRA court further held that any alleged deal between the Commonwealth and Donnelly and/or Vogel was speculative as there was little, if any, evidence demonstrating the existence of deals in exchange for testimony. The court reasoned that even if the alleged items had been suppressed, the requisite prejudice for a *Brady* violation was lacking because the disclosure of such evidence would not have affected the outcome of the trial. The court emphasized that trial counsel challenged the credibility of all three inmate witnesses by

presenting testimony that Appellant was not friendly with those women and did not make the comments at issue.

■ We agree with the Commonwealth that the PCRA court's findings of fact are supported by the record and that its conclusions of law are free of legal error. Initially, as noted by the Commonwealth and the PCRA court, Appellant's allegations relating to the suppression of medical and/or criminal records fail as they could have been obtained by subpoena from non-governmental sources. *See Commonwealth v. Spotz*, 587 Pa. 1, 896 A.2d 1191, 1248 (2006) ("It is well established that no *Brady* violation occurs where the parties had equal access to the information or if the defendant knew or could have uncovered such evidence with reasonable diligence.") (internal citation omitted).

Moreover, Appellant has failed to demonstrate that she was prejudiced by the allegedly suppressed evidence relating to the jailhouse informants. A careful review of the record indicates that trial counsel was able to discredit substantially the testimony of the inmate witnesses without suggesting that they garnered favorable treatment in exchange for their testimony. Trial counsel brought to light that Donnelly had been transferred to the Washington County Correctional Facility because she was suffering from mental health problems, N.T., Nov. 8, 2000, at 541; that Chandler had 18 criminal convictions, most of them relating to theft, *id.* at 511; and that Vogel had not been particularly close to Appellant and was residing in a drug-treatment facility. *Id.* at 488. Additionally, trial counsel called several witnesses to discredit the inmates' testimony. Considering the overwhelming evidence establishing Appellant's guilt, as noted *supra*, and the fact that the inmates' testimony was challenged sufficiently both on cross-examination and by additional witnesses called by the defense, we conclude that the absence of the allegedly withheld evidence did not deny Appellant a fair trial or result in a verdict that was not worthy of confidence. *See Weiss*, 986 A.2d at 816.

 

### C. Carrie Tharp

◼ Appellant's last *Brady* claim alleges that the Commonwealth suppressed evidence indicating that Appellant's step-mother, Carrie Tharp, was on parole at the time she testified at Appellant's trial. As noted, Tharp testified, *inter alia*, that Appellant did not allow Tausha to eat, refused to allow Tharp to see the child after Tharp had fed her at a party; and that Tharp reported Appellant's neglect and abuse of Tausha to CYS. N.T., Nov. 8, 2000, at 554, 558, and 559.[13] The Commonwealth responds, as it did in relation to similar *Brady* claims involving the jailhouse informants, that any parole that may have been granted would have been a matter of public record, readily obtainable by the defense from non-governmental sources. As noted, *supra*, we agree with this analysis and conclude that Appellant is not entitled to relief on this claim.

### II. Conflict of Interest

◼ Appellant next contends that she was denied the effective assistance of counsel because trial counsel, who was a member of the Washington County Public Defender's Office,[14] labored under irreconcilable and actual conflicts of interest that adversely affected her representation. She argues that trial counsel could not effectively cross-examine jailhouse informants, Donnelly, Chandler, and Vogel during the guilt phase of trial because trial counsel and the Public Defender's Office had represented each witness in the cases that resulted in their incarceration with Appellant. Appellant sets forth several items of impeachment evidence that trial counsel failed to use in his cross-examination of the witnesses as examples of counsel's deficient representation. Appellant contends that

13. The PCRA court did not discuss Appellant's *Brady* claim as it relates to Carrie Tharp.

14. Representation by one member of a public defender's office applies to all members of the office. *See Commonwealth v. Westbrook*, 484 Pa. 534, 400 A.2d 160, 162 (1979) (holding that members of the public defender's office would be considered members of the same firm for purposes of a question of conflict of interest in multiple representations).

where counsel has an actual conflict of interest, as allegedly occurred herein, the court should presume that prejudice results therefrom.[15]

In response, the Commonwealth contends that Appellant failed to demonstrate ineffective assistance of counsel based upon a conflict of interest. This is not a case of concurrent representation, it asserts, because Appellant's allegations concern only trial counsel's previous representation of the enumerated individuals in cases that were unrelated to the instant murder, and that had been concluded prior to Appellant's trial. The Commonwealth argues that, under such circumstances, where an actual conflict of interest is absent, prejudice is not presumed, but rather must be demonstrated. *See Commonwealth v. Karenbauer*, 552 Pa. 420, 715 A.2d 1086, 1094 (1998) (holding that "[a] defendant cannot prevail on a conflict of interest claim absent a showing of actual prejudice").

The Commonwealth contends that Appellant failed to establish prejudice because she did not demonstrate that trial counsel's alleged deficiencies (*i.e.*, his purported failure to impeach effectively the jailhouse informant witnesses) resulted from his prior representations. Stated differently, it submits that Appellant did not prove by a preponderance of the evidence that trial counsel's alleged omissions were in any way related to his previous representation of the enumerated individuals.

The Commonwealth asserts that Appellant does not suggest that trial counsel's performance in this regard was based on a pecuniary interest counsel may have had in representing the named individuals in the future or because counsel was afraid to divulge confidential information disclosed to him during the prior representation. *See Commonwealth v. Munson*, 419

---

**15.** Additionally, Appellant argues that trial counsel labored under a conflict of interest due to his prior representation of Appellant's father, Larry Tharp Sr., and the fathers of Appellant's children, David Lanham and Anthony McKee. Appellant claims that such representation prevented counsel from presenting mitigation evidence relating to such individuals during the penalty phase. We need not address the penalty phase component of the conflict of interest claim as we are awarding Appellant a new penalty hearing on a distinct issue.

Pa.Super. 238, 615 A.2d 343, 347 (1992) (citing *United States v. Jeffers*, 520 F.2d 1256, 1264–1265 (7th Cir.1975), cert. denied, 423 U.S. 1066, 96 S.Ct. 805, 46 L.Ed.2d 656 (1976)) (holding that where the alleged conflict of interest is based on prior representation of a prosecution witness, the following two factors arguably may interfere with effective cross-examination, and, thus, effective assistance of counsel: (1) the concern that the lawyer's pecuniary interest in potential future business may cause him to avoid vigorous cross-examination which might be offensive to the witness; and, (2) the possibility that privileged information obtained from the witness might be relevant to the cross-examination).

 The PCRA court denied Appellant relief on his conflict of interest claim, holding that prejudice is only presumed when an actual conflict burdens counsel, and that an actual conflict is demonstrated where counsel was actively burdened by conflicting interests, which affected counsel's performance. The court concluded that Appellant had failed to demonstrate an actual conflict of interest and failed to develop the underlying claims in accordance with the ineffectiveness rubric.

 The PCRA court's conclusion that Appellant has failed to demonstrate a conflict of interest is sound. "While it is true that prejudice is presumed when counsel is burdened by an actual conflict of interest, this is so only if the defendant demonstrates that counsel 'actively represented conflicting interests' and 'that an actual conflict of interest adversely affected his lawyer's performance.'" *Commonwealth v. Buehl*, 510 Pa. 363, 508 A.2d 1167, 1175 (1986) (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 350, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)). We have held that there is an actual conflict of interest when, during the course of counsel's representation, the clients' interests "diverge with respect to a material factual or legal issue or to a course of action." *Commonwealth v. Collins*, 598 Pa. 397, 957 A.2d 237, 251 (2008) (citing *Commonwealth v. Padden*, 783 A.2d 299, 310 (Pa.Super.2001)). Counsel's representation of a client is not perpetual through

the expiration of the client's entire sentence. *Commonwealth v. Weiss*, 986 A.2d at 818.

Here, as noted by the Commonwealth, Appellant has not demonstrated that trial counsel actively represented conflicting interests. Appellant's allegations are based upon trial counsel's representation of the jailhouse informants prior to Appellant's trial,[16] and Appellant has not demonstrated that the interests of counsel's clients' diverged as to any material fact, legal conclusion, or course of action taken by counsel. Thus, this case involves successive and not dual representation, and Appellant must demonstrate that he was prejudiced by any potential conflict of interest. *See Commonwealth v. Spotz*, 896 A.2d at 1231–32 (holding that the defendant was not prejudiced by counsel's representation of a witness prior to when counsel was appointed to represent the defendant); *Buehl*, 508 A.2d at 1175 (holding that "Appellant's defense was not prejudiced by the fact that, at a prior time, his counsel had represented a Commonwealth witness").

Appellant has failed to demonstrate the requisite prejudice as she provides no nexus between trial counsel's previous representation of the enumerated individuals and counsel's performance at Appellant's trial. As recognized by the PCRA court, Appellant offers no evidence that trial counsel restricted his cross-examination of the jailhouse informants because he was laboring under a conflict of interest. Accordingly, Appellant is not entitled to relief. *See Spotz*, 896 A.2d at 1232 (rejecting claim based on counsel's representation of a client which had terminated prior to his appointment to represent the defendant because the defendant offered nothing more than bald assertions, with no evidence to suggest that counsel's conduct was due to the alleged conflict of interest).

16. Appellant attempts to dispute this characterization and asserts that the Washington County Public Defender's Office represented Chandler in a five case consolidated plea and sentencing on October 30, 2000, two days before Appellant's case began. Reply Brief of Appellant at 6. This assertion, however, does not overcome Appellant's failure to demonstrate either an actual conflict of interest or prejudice arising from counsel's prior representation.

## III. Failure to Present a Guilt Phase Diminished Capacity Defense

Appellant next contends that trial counsel rendered constitutionally deficient representation because he failed to investigate and present a diminished capacity defense. The defense at trial, Appellant asserts, was that Appellant was an unfit mother who was overwhelmed by caring for the special needs of her child, and that she lacked the specific intent to kill. According to Appellant, this theory is consistent with a diminished capacity defense, which reduces the degree of murder from first to third degree based on the absence of a specific intent to kill. Appellant argues that trial counsel had evidence to support such defense, namely a report by Dr. Michael Moran, Ph.D, evidencing that Appellant was competent to stand trial, but that her capacity to make moral judgments and to modify her behavior might have been diminished by mental health disorders.[17]

The Commonwealth responds that, regardless of whether trial counsel was put on notice that Appellant suffered from mental health disorders, counsel's failure to present a diminished capacity defense cannot be considered ineffective because Appellant never admitted to starving her child, but rather contended that Tausha died from a medical condition known as failure to thrive. Contrary to the expert testimony establishing that Tausha had nothing to eat or drink for several days prior to her death, the Appellant testified at trial that she fed Tausha the day before she died, and denied having killed her daughter. Absent an admission of guilt, the Commonwealth contends, trial counsel had no legal basis to present a diminished capacity defense, and cannot be found ineffective for failing to do so. *See Commonwealth v. Hutch-*

---

17. Appellant further relies on this Court's plurality decision in *Commonwealth v. Moore*, 569 Pa. 508, 805 A.2d 1212 (2002), which held that trial counsel was ineffective for failing to present a diminished capacity defense. *Moore* is clearly distinguishable, however, because the defendant in that case argued self-defense at trial, which is not mutually exclusive from the defense of diminished capacity. Here, Appellant never admitted that she killed her daughter, and contended that the child died from a medical condition.

*inson,* 611 Pa. 280, 25 A.3d 277, 312–13 (2011) (holding that the authority to concede liability for murder rests solely with the defendant, and counsel has no authority to present a diminished capacity defense absent the defendant's concession of liability).

█ The PCRA court agreed with the Commonwealth and rejected Appellant's claim. It held that there was no arguable merit to the failure to investigate portion of the claim because trial counsel hired Dr. Michael Moran who provided counsel with evidence that Appellant was suffering from numerous medical conditions. The PCRA court likewise found no arguable merit to the claim that trial counsel was ineffective for failing to present a diminished capacity defense because such defense would have been inconsistent with the defense theory that Tausha died from the medical condition known as failure to thrive. It emphasized that Appellant never admitted responsibility for killing her daughter, which is required to present a diminished capacity defense. The court explained that had counsel's chosen strategy been successful, Appellant would have been acquitted, but if counsel had successfully presented a diminished capacity defense, Appellant would have been found guilty of a lesser degree of homicide.

█ The PCRA court's factual finding that Appellant never conceded liability for the murder is supported by the record, and its legal conclusion that counsel had no basis in the law to present a diminished capacity defense, absent such concession, is free from error. "A defense of diminished capacity, whether grounded in mental defect or voluntary intoxication, is an extremely limited defense available only to those defendants who admit criminal liability but contest the degree of culpability based upon an inability to formulate the specific intent to kill." *Commonwealth v. Hutchinson,* 25 A.3d at 312.

Because Appellant denied that she killed her daughter by starvation, and contended that the child died naturally from a medical condition, trial counsel had no legal basis to pursue a diminished capacity defense. Accordingly, Appellant's ineffec-

tiveness claim fails for lack of arguable merit, and the PCRA court did not err by denying her relief. *See Commonwealth v. Birdsong*, 611 Pa. 203, 24 A.3d 319, 333 (2011) (holding that trial counsel was not ineffective for failing to pursue a diminished capacity defense, notwithstanding that evidence suggested that the defendant suffered from post-traumatic stress disorder, because the defendant at all times maintained his innocence, thereby negating the defense); *Commonwealth v. Spotz*, 896 A.2d at 1218 (holding that "[a]bsent an admission from [the defendant] that he had shot and killed [the victim], trial counsel could not have presented a diminished capacity defense").

### IV. Failure to Challenge Commonwealth's Evidence

Appellant next contends that trial counsel was ineffective for failing to challenge the Commonwealth's evidence and for failing to present evidence in support of her defense that Tausha died from the medical condition of failure to thrive. There are several components to this ineffectiveness claim. Appellant argues that trial counsel was ineffective for: (1) failing to present medical records documenting Tausha's failure to thrive condition; (2) failing to present the testimony of Appellant's oldest daughter, Tonya, and Billie Bittinger; (3) failing to impeach the testimony of codefendant Douglas Bittinger with his prior inconsistent statements; and (4) failing to impeach the testimony of Carrie Tharp with her parole status and her hatred of Appellant.

### A. Failure to Present Medical Records

Appellant argues that trial counsel failed to present medical records from Mercy Hospital relating to the first three years of Tausha's life to support the argument that Tausha was born prematurely, was diagnosed with failure to thrive, and could not gain weight, even when in the hospital. Appellant submits that trial counsel argued these facts to the jury, but presented no documentation in support thereof. She asserts that the Mercy Hospital medical records from 1991 and 1992 contained nursing staff notations from three prolonged hospital admissions, which indicated that Tausha ate

well, but did not gain weight. Appellant concludes that the medical records directly contradicted the Commonwealth's assertions that Tausha only failed to gain weight when in Appellant's care, and corroborated Appellant's testimony to the contrary.

The Commonwealth refutes Appellant's claim by contending that the very records that Appellant faults trial counsel for failing to introduce were explored at length at trial during the testimony of defense forensic pathology expert, Dr. Karl Williams. N.T., Nov. 9, 2000, at 698–772. Because the information in the records was conveyed to the jury through the testimony of Dr. Williams, the Commonwealth concludes that Appellant could not have been prejudiced by trial counsel's failure to introduce the medical records into evidence. The PCRA court summarily rejected Appellant's claim, holding that she failed to develop the ineffectiveness argument, and, thus, had not met her burden of proof. PCRA Ct. Op. at 26 n. 17.

A careful review of the record reveals that Appellant was properly denied relief. As cogently noted by the Commonwealth, while trial counsel may not have introduced into evidence the records from Mercy Hospital, he presented to the jury the information contained therein through the testimony of defense medical expert, Dr. Williams. Dr. Williams explained that he reviewed the medical records from Mercy Hospital, which indicated that Tausha suffered from a variety of significant physical and organic medical problems resulting from her premature birth, including severe neurologic delays, immune system deficiencies, and failure to thrive. N.T., Nov. 9, 2000, at 702–04. He opined that the cause of Tausha's death was severe malnutrition due to organic and nonorganic failure to thrive; the organic failure to thrive encompassing documented endocrine, immunologic, infectious, and neurodevelopmental problems. *Id.* at 713. Significantly, Dr. Williams testified that one particular Mercy Hospital discharge summary indicated that Tausha did not gain weight while in the hospital, but actually lost weight. *Id.* at 756. Accordingly, because Dr. Williams informed the jury of the same informa-

tion that Appellant faults trial counsel for failing to present, no prejudice resulted from trial counsel's failure to introduce the Mercy Hospital records into evidence.

## B. Failure to Call Defense Witnesses

Appellant next argues that trial counsel was ineffective for failing to present the testimony of Tonya McKee, Appellant's oldest daughter, and Billie Bittinger, who is Douglas Bittinger's mother. She submits that McKee, who was thirteen years of age at the time of her mother's trial, could have testified that Appellant did not abuse the decedent, but rather that it was Douglas Bittinger who abused Appellant and the children, as documented by police reports of domestic violence in the house. Appellant further maintains that Billie Bittinger could have testified that she was often present in the home and observed that Tausha was extremely small for her age, and suffered from diarrhea after consuming food. She submits that Billie Bittinger could have also testified that Appellant did not treat Tausha different from her other children. Appellant contends that trial counsel lacked a reasonable basis for failing to call these witnesses, and that she was prejudiced by counsel's omission because such testimony would have supported her defense.

"To prevail on a claim that trial counsel was ineffective for failing to present a witness, the defendant must demonstrate that: (1) the witness existed; (2) counsel was either aware of or should have been aware of the witness's existence; (3) the witness was willing and able to cooperate on behalf of the defendant; and (4) the proposed testimony was necessary to avoid prejudice to the defendant." *Commonwealth v. Bryant*, 579 Pa. 119, 855 A.2d 726, 746 (2004) (citing *Commonwealth v. Begley*, 566 Pa. 239, 780 A.2d 605, 630 (2001)).

The Commonwealth contends that Appellant is not entitled to relief because she failed to present either an affidavit from Tonya McKee or her testimony at the PCRA evidentiary hearing, to establish that she was willing and able to testify at her mother's trial. It further argues that the ineffectiveness

claim relating to Billie Bittinger likewise fails because her proffered testimony during the PCRA proceedings added little, if anything, to Appellant's defense, considering that other testimony established that Tausha was small for her age and had medical ailments. The PCRA court rejected these claims, finding that Appellant failed to develop an ineffective assistance of counsel claim, and that the absence of the proposed testimony was not so prejudicial as to have denied Appellant a fair trial. PCRA Ct. Op. at 25.

We conclude that the PCRA court did not err in denying Appellant relief. As noted by the Commonwealth, Appellant failed to demonstrate that her daughter was willing and able to testify at Appellant's trial. Thus, the claim fails for lack of arguable merit. As to the purported failure of trial counsel to present the testimony of Bittie Bittinger, we agree that Bittinger's testimony was not necessary to avoid prejudice to Appellant because her proffered testimony was cumulative of evidence already presented by the defense.

## C. Failure to Impeach Doug Bittinger

Appellant argues that trial counsel was ineffective for failing to impeach the testimony of Doug Bittinger with two letters he wrote to Appellant prior to trial, which indicated that Appellant never abused Tausha, and that Appellant loved Tausha to the same extent as she loved her other children. She also contends trial counsel was ineffective for failing to impeach Bittinger's testimony with several statements Bittinger made to his attorney regarding Appellant's innocence. As noted, Doug Bittinger testified at trial that Appellant withheld food from Tausha, directed others to do the same, and failed to show love or affection to Tausha, as she did for her other children. Appellant contends that trial counsel lacked a reasonable basis for failing to impeach Bittinger's testimony on the aforementioned grounds, and asserts that she was prejudiced by trial counsel's omission because the jury was never informed that Bittinger did not provide damning evidence against Appellant until his own murder trial was approaching.

The Commonwealth responds that Appellant's ineffectiveness claim fails for lack of prejudice because trial counsel effectively impeached Bittinger's testimony at trial. It points out that trial counsel cross-examined Bittinger regarding: (1) his inconsistent statements given to law enforcement regarding Tausha's death; (2) his meeting with the District Attorney concerning Appellant's murder charges on three occasions prior to Appellant's trial; (3) his initial statement to the District Attorney that he was unwilling to testify against Appellant because Appellant did nothing wrong; (4) the fact that he did not come forward with incriminating evidence until about two weeks before Appellant's trial; and (5) his statement that he expected nothing in return for his testimony even though he faced the death penalty for the same offense as Appellant. N.T., Nov. 8, 2000, at 431–470.

The PCRA court denied Appellant relief, noting that she failed to develop this claim meaningfully. PCRA Ct. Op. at 21. Nevertheless, the PCRA court emphasized that trial counsel cross-examined Bittinger about his motivations for testifying and placed on the record the fact that he was facing the same charges as Appellant, along with the additional charge of aggravated assault. Thus, the court concluded, counsel placed in the minds of the jurors the possibility that Bittinger was testifying in order to save his own life.

The PCRA court did not err in denying Appellant relief. The record support's the Commonwealth's contentions that while trial counsel did not impeach Bittinger with the two letters he sent to Appellant and with his prior statements to his counsel regarding Appellant's innocence, trial counsel's cross-examination of Bittinger substantially revealed these facts, which Appellant alleges the jury never heard. As noted, trial counsel elicited from Bittinger that he initially declined to testify against Appellant, and did not offer evidence against her until nearly two weeks before her trial. N.T., Nov. 8, 2000, at 465, 469. Trial counsel further elicited that Bittinger was also facing the death penalty for the murder of Tausha, and suggested that this readily served as a motive for Bittinger to lie. Id. at 469. Under these circumstances, we conclude

that Appellant was not prejudiced by trial counsel's failure to impeach Bittinger's testimony with the two prior letters he sent to Appellant and his prior comments to his counsel.

### D. Failure to Impeach Carrie Tharp

Appellant next argues that trial counsel was ineffective for failing to impeach the testimony of Carrie Tharp, Appellant's step-mother, with evidence of her well-known hatred of Appellant and that she was on parole from a drunk driving conviction in Washington County at the time she testified at Appellant's trial. As noted, Tharp testified, *inter alia*, that Appellant did not allow Tausha to eat, refused to allow Tharp to see the child after Tharp had fed her at a party; and that Tharp reported Appellant's neglect and abuse of Tausha to CYS. N.T., Nov. 8, 2000, at 554, 558, and 559. Appellant concedes that trial counsel cross-examined Carrie Tharp as to whether she held any animosity toward Appellant after Carrie's husband, Michael Tharp, left Carrie for a woman that Appellant had introduced to him. She argues, however, that trial counsel's performance was constitutionally deficient because trial counsel did not present the testimony of Michael Tharp, who would have contradicted Carrie's testimony that she had no bias towards Appellant. Appellant further suggests that Carrie's parole status would have demonstrated that she had a bias in favor of the Commonwealth.

The Commonwealth responds that this claim is meritless because Appellant has failed to present any evidence that Michael Tharp was willing and available to testify at her trial, nor that his testimony would have supported Appellant's claim. It points out that Michael Tharp's affidavit submitted during the PCRA proceeding, stated only that Appellant and Carrie Tharp "did not get along." PCRA Exhibit 63. As to counsel's failure to impeach Carrie Tharp on her parolee status, the Commonwealth contends that no prejudice resulted from counsel's omission because Appellant has failed to establish, or even assert, that Carrie Tharp gained any benefit while on parole in exchange for her testimony against Appellant.

The PCRA court rejected Appellant's claim, finding that it, like many of Appellant's ineffectiveness claims, was not meaningfully developed. It further noted that Appellant's conviction of driving under the influence did not involve dishonesty or false statement, and, thus would not have been proper impeachment evidence.

This claim fails for lack of prejudice as Carrie Tharp's testimony of the neglect and abuse Appellant inflicted upon Tausha was cumulative of evidence from various witnesses establishing that Appellant deliberately withheld food from her with the intent to starve her to death. Thus, Appellant's challenge to counsel's stewardship does not entitle her to relief.

## V. Failure to Present Character Evidence

█ Appellant argues that trial counsel was ineffective for failing to present evidence of her good character during the guilt phase of the trial, which could have raised in the minds of the jury a reasonable doubt as to her guilt. She argues that her cousin, Mary Renee Walkup, who resided in Ohio at the time of Appellant's trial, could have testified that Appellant had a good reputation in the community for being a law-abiding, peaceful, and honest person. Appellant suggests that such testimony would have bolstered the credibility of her trial testimony that she never intended to harm Tausha. Appellant further suggests that defense witness Denise Pierce–Wilson could have also testified to Appellant's reputation for honesty. She maintains that trial counsel lacked a reasonable basis for failing to present this character testimony, and that she was prejudiced by trial counsel's omission.

The Commonwealth responds that Appellant's ineffectiveness claim lacks arguable merit because Walkup's testimony at the PCRA evidentiary hearing demonstrates that she could not have provided admissible evidence with respect to Appellant's character. It explains that Walkup testified that she had not lived in the same community as Appellant since she was a teenager, and never indicated that she had any conversations with others regarding Appellant's reputation in the

community as a peaceful, law-abiding, and honest person. *See Commonwealth v. Keaton*, 615 Pa. 675, 45 A.3d 1050, 1074 (2012) (citing *Commonwealth v. Blount*, 538 Pa. 156, 647 A.2d 199, 206 (1994)) (holding that "character evidence is not the opinion of one person or even a handful of persons, but must represent the consensus of the community"). The Commonwealth further asserts that although the affidavit of Pierce–Wilson establishes that she would have testified that Appellant had a reputation in the community as a peaceful person, PCRA Exhibit 62, the affidavit fails to lay the appropriate foundation to admit character evidence because Pierce–Wilson failed to state how her opinion represented the consensus of the community.

The PCRA court denied Appellant relief on this claim based on the prejudice prong of the ineffective assistance of counsel standard, concluding that trial counsel's presentation of character evidence would not have altered the outcome of Appellant's trial. Specifically, it held that evidence that Appellant had a reputation for being honest and peaceful in the community would not have created a reasonable doubt as to Appellant's guilt, considering the extensive testimony of several witnesses that Appellant deliberately and methodically withheld food from her child for purposes of starving her to death. The court further emphasized the testimony of the medical examiner, describing Tausha's condition at the time of death, and indicating that her death resulted from malnutrition due to starvation.

The PCRA court's factual findings are supported by the record and the ruling that Appellant's ineffective assistance of counsel claim fails for lack of prejudice is free from error. While character evidence alone may be sufficient to raise a reasonable doubt and, thus, justify an acquittal, *Commonwealth v. Morgan*, 559 Pa. 248, 739 A.2d 1033, 1037 (1999), the presentation of character evidence under the facts presented would not have created in the minds of the jury a reasonable doubt as to Appellant's guilt. As noted by the PCRA court, Appellant's testimony that she never withheld food from Tausha was refuted by several witnesses, who detailed the daily

neglect and abuse that Appellant inflicted repeatedly upon Tausha over the period of several years. Further, the medical examiner testified that Tausha had not eaten for several days prior to her death, that she weighed less than twelve pounds at seven years of age, and that she died as a result of malnutrition due to starvation. We conclude without hesitation that trial counsel's failure to present evidence demonstrating that Appellant had a reputation in the community for being honest would not have raised a reasonable doubt in the jury's mind as to Appellant's guilt.

## VI. Failure to Object to Appellant's Absence

Appellant contends that trial counsel was ineffective for failing to object when critical stages of the proceedings occurred in her absence. These purported "critical stages" include the following: (1) an October 31, 2000 pretrial conference where the District Attorney indicated that Douglas Bittinger would be testifying against Appellant without receiving any benefit from the Commonwealth; (2) a November 1, 2000 pretrial conference to discuss *voir dire;* (3) a November 7, 2000 conference where the District Attorney and trial counsel discussed the admissibility of a videotape; (4) a November 9, 2000 conference where the District Attorney and trial counsel questioned jurors regarding an off-the-record comment they overheard in the restroom; and, (5) a November 13, 2000 conference where the District Attorney and trial counsel stipulated to the aggravating circumstance that the victim was less than twelve years of age and the mitigating circumstance that Appellant had no significant history of prior criminal convictions.[18] Appellant contends that trial counsel lacked a reasonable basis for failing to halt each of these proceedings until she could be present. Appellant further argues that a demonstration of prejudice is not required because her absence during critical stages of trial constitutes structural error.[19]

18. Appellant lists additional dates of proceedings purportedly held in her absence, but fails to address what occurred on such dates or develop in any way how such portion of the proceeding constituted a critical stage of trial.

19. Appellant relies on the Superior Court's decision in *Commonwealth v. Cohen,* 133 Pa.Super. 437, 2 A.2d 560 (1938), for the proposition that

716

The Commonwealth responds that Appellant's ineffectiveness claim fails for lack of arguable merit as none of the challenged proceedings constituted critical stages of Appellant's trial. It emphasizes that at each pretrial conference, Appellant was represented by counsel, and no testimony was taken. The Commonwealth further asserts that during the remaining in-chamber proceedings, Appellant was represented by counsel, and no motions were ruled upon. It emphasizes that Appellant was present during the *voir dire* of every prospective juror, and no jurors were excused in her absence.

The PCRA court agreed with the Commonwealth, and held that Appellant's ineffectiveness claim lacked arguable merit. It explained that most of the proceedings at issue constituted pre-trial conferences, routinely held by courts throughout the Commonwealth without the defendant's presence. *See Commonwealth v. McNamara*, 443 Pa.Super. 448, 662 A.2d 9, 13–14 (1985) (quoting *Commonwealth v. McLaurin*, 292 Pa.Super. 392, 437 A.2d 440, 443 (1981) (holding that "[i]t is widely recognized that a defendant's presence during all stages of the trial does not extend to purely procedural matters preparatory to the trial")). The PCRA court further held that the remaining proceedings involved purely trial-related procedural matters, and that Appellant was not required to be present during these discussions. *See Commonwealth v. Carter*, 219 Pa.Super. 280, 281 A.2d 75, 80 (1971) (holding that "a defendant's presence is required only where there is a reasonable substantial relation to the fullness of the opportunity to defend the charge").

The PCRA court's findings of fact are supported by the record and its conclusion of law is free from error. "Article I, § 9 of the Pennsylvania Constitution and Pennsyl-

the absence of a record of the challenged "proceeding" compels a finding of prejudice. *Cohen*, however, is not binding upon this Court and is distinguishable because in that case, the defendant's conviction was reversed on the ground that neither counsel nor the defendant was present during the general jury charge, and no record was available. To the contrary, here, Appellant's counsel was present during every challenged proceeding, and no proceeding involved the trial court's charging of the jury.

vania Rule of Criminal Procedure 602 guarantee the right of an accused to be present in the courtroom at every stage of a criminal trial." *Commonwealth v. Hunsberger,* 619 Pa. 53, 58 A.3d 32, 38 (2012).[20] Such right, however, is not absolute. Id. at 38. A defendant "has a due process right to be present in his own person whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." *Id.* at 37 (citing *Kentucky v. Stincer,* 482 U.S. 730, 745, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987) (internal citation omitted)). Accordingly, "the defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Id.*

▮▮▮▮▮▮ Appellant has failed to demonstrate that any of the challenged proceedings constituted a critical stage of trial; thus her ineffectiveness claim fails for lack of merit. During the pretrial conference that occurred on October 31, 2000, the District Attorney announced Douglas Bittinger's voluntary decision to testify for the Commonwealth. Appellant's substantive rights were not affected by the mere announcement of Bittinger's testimony, as she had the ability to cross-examine this testimony at trial on the basis, *inter alia,* that the Commonwealth promised Bittinger leniency in exchange for his testimony. Further, while *voir dire* was discussed during the November 1, 2000 pretrial conference, no *voir dire* was actually conducted, and no jurors were empaneled or dismissed. Appellant has likewise failed to demonstrate that it was critical for her to be present during the November 7, 2000 conference when the District Attorney and trial counsel discussed the admissibility of a videotape depicting Tausha at a birthday party.

▮▮▮▮▮▮ Similarly, the November 9, 2000 conference, during which the District Attorney and trial counsel questioned jurors regarding an off-the-record comment they overheard in

---

**20.** Pennsylvania Rule of Criminal Procedure 602 provides that a defendant "shall be present at every stage of the trial including the impaneling of the jury and the return of the verdict, and the imposition of sentence...." Pa.R.Crim. 602(a).

the restroom, cannot be said to constitute a critical stage of the trial. *See Commonwealth v. Proctor*, 526 Pa. 246, 585 A.2d 454, 460 (1991) (rejecting claim that trial counsel was ineffective for failing to object when the trial court questioned a juror in chambers with trial counsel present, but without the defendant being present). Finally, even if Appellant had demonstrated that her presence was required at the November 13, 2000 conference where the District Attorney and trial counsel stipulated to the aggravating circumstance that the victim was less than twelve years of age and the mitigating circumstance that Appellant had no significant history of prior criminal convictions, she was not prejudiced by counsel's failure to object to her absence because there is no legal ground upon which to challenge either stipulation as the facts supporting them are beyond dispute. Accordingly, Appellant's ineffectiveness fails, and the PCRA court did not err by denying her relief.

## VII. Cumulative Error in Guilt Phase

Appellant next contends that she is entitled to a new trial because the cumulative effect of the errors in this case undermines the confidence in the outcome of the trial. This Court has repeatedly held that "no number of failed claims may collectively warrant relief if they fail to do so individually." *Commonwealth v. Rainey*, 593 Pa. 67, 928 A.2d 215, 245 (2007). Nevertheless, we have acknowledged that "if multiple instances of deficient performance are found, the assessment of prejudice properly may be premised on cumulation." *Commonwealth v. Sepulveda*, 618 Pa. 262, 55 A.3d 1108, 1150 (2012) (citing *Commonwealth v. Johnson*, 600 Pa. 329, 966 A.2d 523, 532 (2009)). The claims that we have denied solely on a lack of prejudice include: Issue II (relating to trial counsel's alleged conflict of interest); Issue IV (relating to trial counsel's alleged failure to challenge the Commonwealth's evidence); and Issue V (relating to trial counsel's alleged failure to present character evidence). We note that we did not deem the ineffectiveness claims to be of arguable merit, but rather denied relief addressing only the prejudice prong of

the ineffectiveness standard. *See Sepulveda*, 55 A.3d at 1117–18 (holding that if a claim fails under any necessary element of the ineffectiveness test, the court may proceed to that element first). Upon review, we conclude without hesitation that these claims do not afford Appellant relief individually, and likewise do not afford Appellant relief in the aggregate.

## Penalty Phase Claims

### VIII. Failure to Present Mitigation Evidence

Appellant contends that trial counsel was ineffective for failing to investigate and present at the penalty hearing the readily available evidence documenting her brain damage, mental health disorders, low I.Q., childhood abuse, domestic abuse by former boyfriends, and her exemplary behavior in prison prior to trial. She emphasizes that trial counsel presented no witnesses or documentary evidence whatsoever during the penalty phase. Rather, Appellant maintains, the only mitigation evidence presented on her behalf was a stipulation that she had no prior criminal record and an incorporation of the evidence presented during the guilt phase of trial.

Moreover, Appellant contends, trial counsel's testimony at the PCRA evidentiary hearing demonstrates that he conducted no investigation into mitigation evidence, obtained no records regarding Appellant's background, and failed to utilize a mental health evaluation that was in counsel's possession. She submits that trial counsel had no strategic reason for failing to present the proffered mitigation evidence, described in detail *infra*, of which counsel should have been aware. Considering that the jury found only a single aggravating factor based on the age of the victim, Appellant concludes that she was clearly prejudiced by trial counsel's stewardship during the penalty phase.

It is well-established that capital counsel has an obligation under the Sixth Amendment to conduct a reasonably thorough investigation for mitigating evidence or to make reasonable decisions that make further investigation unneces-

sary. *Commonwealth v. Lesko,* 609 Pa. 128, 15 A.3d 345, 380 (2011); *Commonwealth v. Sattazahn,* 597 Pa. 648, 952 A.2d 640, 655 (2008); *Strickland v. Washington,* 466 U.S. 668, 691, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "Counsel's duty encompasses pursuit of all statutory mitigators of which he is aware or reasonably should be aware, unless there is some reasonable ground not to pursue the circumstance (such as when it might open the door to harmful evidence.)". *Commonwealth v. Malloy,* 579 Pa. 425, 856 A.2d 767, 787 (2004). In evaluating an ineffectiveness claim alleging counsel's failure to investigate and present mitigation evidence in a capital case, "we consider a number of factors, including the reasonableness of counsel's investigation, the mitigation evidence that was actually presented, and the additional or different mitigation evidence that could have been presented." *Lesko,* 15 A.3d at 380; *Commonwealth v. Collins,* 585 Pa. 45, 888 A.2d 564, 580 (2005). None of the aforementioned factors is, by itself, dispositive, because even if counsel's investigation is deemed unreasonable, the defendant is not entitled to relief unless the defendant demonstrates that prejudice resulted from counsel's conduct. *Id.*

We begin, as we must, with a review of the reasonableness of trial counsel's investigation. At the PCRA evidentiary hearing, trial counsel acknowledged that he presented Appellant's guilt phase testimony that she had a difficult childhood due to a dysfunctional family, and that she was the victim of domestic violence. N.T., Apr. 26, 2010, at 51. The record reveals, however, that trial counsel did not attempt to corroborate Appellant's claims of abuse by interviewing members of her family. Trial counsel indicated that he and/or his investigator interviewed only Appellant's father and grandmother for purposes of the guilt phase, did not inquire about Appellant's upbringing or domestic abuse, and, significantly, did not seek contact information for other family members who could have illustrated Appellant's difficult childhood and abusive relationships. *Id.* at 51–54, 57.

When PCRA counsel asked trial counsel if he had any reason for not interviewing other family members for pur-

poses of penalty-phase presentation, trial counsel responded, "All I can tell you is we contacted everyone that [Appellant] had indicated would be helpful to her trial and that she provided either addresses or phone numbers for." *Id.* at 54.[21] Appellant's PCRA counsel then proceeded to read the investigator's notes, which referenced that Appellant identified several family members, *id.* at 55–58, yet none of the enumerated family members had been questioned for purposes of obtaining mitigation evidence for the penalty phase. Trial counsel further indicated that he did not obtain or review Appellant's school, medical, or prison records, or existing criminal records of Appellant's father and former boyfriends, to corroborate Appellant's claims of abuse. *Id.* at 58–59, 63–64.

Additionally, and significantly, trial counsel acknowledged that even though he possessed Appellant's pretrial competency report drafted by Dr. Michael Moran, Ph.D, counsel did not utilize the information in the report for purposes of investigating mental health mitigation evidence. As noted, Dr. Moran evaluated Appellant on December 10, 1998, and his report indicated that Appellant had a borderline range of intellectual functioning, and was markedly impaired in her ability to employ common sense or logical analysis. PCRA Exhibit 75. While Dr. Moran indicated that Appellant was competent to stand trial, he diagnosed her with schizoaffective disorder, adjustment disorder with anxiety, depressive personality disorder, and passive-aggressive personality disorder. *Id.* Trial counsel testified at the PCRA evidentiary hearing that he had no strategic reason for failing to call Dr. Moran during the penalty phase of Appellant's trial. N.T., Apr. 26, 2010, at 50. *See also Id.* at 92 (where trial counsel states, "As I recall the

---

21. When trial counsel was asked whether there were relatives or friends that were reluctant or refused to testify on Appellant's behalf during the penalty phase, counsel responded,

Let me put it to you this way. If they had been uncooperative to testify and they already provided me with information that was favorable to us, I would have subpoenaed them and put them on the stand. My recollection is that we put on everybody we could find to attempt to put them on the stand.

*Id.* at 94. As noted, however, trial counsel presented no witnesses during the penalty phase.

report, [Appellant's] mental capabilities or functioning was borderline, all of which would have been admissible mitigation. I can't tell you why I didn't call [Dr. Moran].").

Having reviewed trial counsel's investigation, we proceed to examine the mitigation evidence that counsel actually presented during the penalty phase. As asserted by Appellant, trial counsel presented no witnesses or documentary evidence during the penalty phase of the trial. Rather, counsel presented only a stipulation that Appellant had no prior criminal record, and incorporated the defense evidence presented during the guilt phase. N.T., Nov. 14, 2000, at 984–986. To reiterate, during the guilt phase of trial, Appellant testified that she was raised by her grandparents after her parents separated; N.T., Nov. 9, 2000, at 780; that Appellant's step-mother, with whom she lived with for one year, physically abused her; *id.* at 781–83; and that Appellant suffered physical abuse at the hands of Anthony McKee, the father of her daughter Tonya, and David Lanham, the father of Tausha. *Id.* at 783–86. Appellant further testified that Tausha was born premature, weighing only 2 pounds, 5 ounces at birth, and that Appellant received no support, financial or otherwise, from the fathers of her children. *Id.* at. 786–87. Appellant also explained that when she became pregnant with another child to Lanham, she decided to place that child for adoption because she was having a difficult time coping with Tausha's health problems. *Id.* at 789–92.

In his closing argument during the penalty phase, trial counsel urged the jury to find two mitigating circumstances: (1) the lack of prior criminal convictions, 42 Pa.C.S. § 9711(e)(1); and (2) the catchall mitigating circumstance relating to the character of the defendant or the circumstances of the offense. *Id.* at § 9711(e)(8). N.T., Nov. 9, 2000, at 991. Trial counsel reminded the jury of Appellant's testimony that she came from a broken home, had no bond with her mother, was abused by her stepmother when her father remarried, and went from one physically abusive relationship to another. *Id.* at 994. Trial counsel also suggested that the jury consider imposing a life sentence because Appellant could potentially

benefit another inmate in prison by explaining her life experiences. *Id.* at 995.[22] The jury found both mitigating circumstances proffered by the defense, but concluded that such mitigators were outweighed by the single aggravating circumstance relating to the youth of the victim.

Appellant argues that there was a plethora of available evidence that trial counsel could have presented to support various mitigating circumstances. She first addresses the Section 9711(e)(8) catchall mitigating circumstance of the character of the defendant and the circumstances of the offense. Specifically, Appellant faults trial counsel for failing to present: (1) testimony from numerous family members, including Larry Tharp, Jr., Michael Tharp, Bob Tharp, Mary Renee Walkup, Mark Tharp, and Ann Mull, who indicated that if contacted by trial counsel they would have testified at Appellant's trial that Appellant had a difficult childhood due to her mother's abandonment, her father's drug-dealing, and her step-mother's physical abuse, and that, as an adult, Appellant had been physically abused by the men in her life;[23] (2) Appellant's school records, which would have demonstrated that she had below-average intelligence, repeated the tenth grade, and graduated nearly last in her class; (3) the criminal records of Appellant's father confirming his drug dealing and driving under the influence of alcohol, PCRA Exhibits 29–31; (4) police records relating to Appellant's former boyfriends, particularly the Burgettstown Police Department incident re-

22. Finally, trial counsel stated in his closing argument:

> We told you all along that Miss Tharp has no one, no one to help her. That's reflected in the testimony she provided yesterday and it's provided in what you did not hear today. You did not see the defense present any witnesses here today. Her father is not here. Her mother is not here. Her brother is not here, although they are all alive. You don't see anybody coming forward to help her.

*Id.* at 996.

23. At the PCRA hearing, Appellant presented the testimony of her half-brother, Michael Tharp, N.T., Apr. 27, 2010, at 307–319, her uncle, Bob Tharp, *id.* at 319–327, her cousin Mary Renee Walkup, *id.* at 342–354, her uncle, Mark Tharp, *id.* at 333–340, and the mother of Appellant's step-mother, Ann Mull. *Id.* at 327–333. Appellant further presented the deposition testimony of her brother, Larry Tharp Jr., deposition dated April 16, 2010.

ports documenting multiple instances of domestic violence perpetrated against Appellant by Douglas Bittinger and David Lanham, PCRA Exhibit 103; and (5) the testimony of prison guards that Appellant had a positive adjustment to being incarcerated.

At the PCRA evidentiary hearing, Appellant also presented the testimony of Kathleen Kaib, a mitigation specialist, who testified that documentation was readily available for her to prepare an extensive report of Appellant's life history, which involved the recurring themes of parental abandonment, domestic violence, both as a child and an adult, drug and alcohol abuse, and low intellectual functioning.

Appellant further submits that there was available evidence that trial counsel could have presented in support of two mitigating circumstances not proffered by the defense at trial, namely, that the defendant was under the influence of extreme mental or emotional disturbance, 42 Pa.C.S. § 9711(e)(2), and that the capacity of the defendant to appreciate the criminality of her conduct or to conform her conduct to the requirements of law was substantially impaired. *Id.* § 9711(e)(3). She argues that trial counsel must have suspected that Appellant suffered from mental health ailments as he sought and obtained funds from the trial court to have her evaluated for purposes of competency to stand trial, and to explore the defenses of insanity and diminished capacity. PCRA Exhibit 107.

Specifically, Appellant relies on: (1) the aforementioned report of Dr. Moran that trial counsel possessed prior to trial indicating that Appellant had borderline intellectual functioning, depression, brain damage and other mental health impairments; (2) a pretrial psychiatric evaluation conducted by the Whale's Tale Family Stabilization Center, indicating that Appellant was being treated for major depression, PCRA Exhibit 76;[24] (3) records from the Washington County Correctional

24. Relating to the catchall mitigating circumstance, the Whales Tale Family Stabilization Center pretrial psychiatric evaluation also indicated that Appellant had been removed from her mother's care when she and her four-month-old brother were found alone in a trailer, locked in

Facility, indicating that Appellant was being treated for depression, PCRA Exhibit 121; and (4) prenatal records of Tausha noting that Appellant may have been suffering from depression before Tausha's birth. PCRA Exhibit 117.

Appellant further presented at the PCRA evidentiary hearing the deposition testimony of Dr. Jonathan Mack, an expert in forensic neuropsychology and psychology, who diagnosed Appellant with brain damage cognitive disorder (not otherwise specified), post-traumatic stress disorder (based on her prior abuse as a child), major depressive disorder, borderline intellectual functioning, borderline independent personality disorders, polysubstance abuse, dissociative disorder, adjustment disorder, and encephalopathy (altered brain function), and opined that all of these disorders existed at the time of Appellant's trial. *See* Deposition of Dr. Mack dated Apr. 16, 2010, at 39–50. Dr. Mack opined that at the time of the murder, Appellant was under the influence of extreme mental and emotional disturbance and her ability to appreciate the criminality of her conduct or to conform her conduct to the requirements of law was substantially impaired. *Id.* at 52.

Appellant also presented at the PCRA evidentiary hearing the testimony of Dr. Moran, who, as noted *supra,* had provided trial counsel with a pretrial psychological evaluation, indicating that Appellant had borderline intellectual functioning, and suffered from various mental health disorders. Dr. Moran agreed with Dr. Mack that at the time of the murder, Appellant was under the influence of extreme mental and emotional disturbance pursuant to the mitigating circumstance set forth at Section 9711(e)(2), and that her capacity to conform her conduct to the requirements of the law was substantially impaired in accord with the Section 9711(e)(3) mitigating circumstance. N.T., Apr. 26, 2010, at 135–36.

Finally, Appellant presented at the PCRA evidentiary hearing the testimony of Dr. Catherine F. Lewis, a forensic psychologist who interviewed Appellant in March of 2005,

a closet; that Appellant was later physically abused by her stepmother; and that there was violence in Appellant's relationships with men, causing her to obtain a protection from abuse order.

years after her trial had concluded. Dr. Lewis diagnosed Appellant with chronic posttraumatic stress disorder, severe major depressive episode, borderline intellectual functioning, and polysubstance abuse in partial remission, and opined that Appellant suffered from these maladies at the time of trial. *Id.* at 274–75. Dr. Lewis testified that Appellant's mental impairments were magnified due to the fact that she had a very sick child, as well as three other children to care for between the ages of six months and nine years. Dr. Lewis agreed with Dr. Moran and Dr. Mack that, at the time of Tausha's death, Appellant was suffering from extreme mental and emotional stress. *Id.* at 291. While the Commonwealth cross-examined Appellant's medical experts during the PCRA proceeding, it did not present any medical expert of its own.

Appellant argues that she was prejudiced by trial counsel's inadequate investigation and failure to present the aforementioned evidence of her background and mental impairments because all of this evidence demonstrated why she was psychologically unable to provide the appropriate care for her daughter. In Appellant's view, considering that the jury found a single aggravating factor relating to the age of the victim, trial counsel's presentation of the proffered evidence of mitigation would have swayed at least one juror to vote for life imprisonment.

The PCRA court denied relief on Appellant's ineffectiveness claim. Initially, it recognized that the mitigation evidence presented to the jury was not as thorough as that presented during the PCRA evidentiary hearings. It held, however, that "[a]lthough [Appellant] likely satisfies the first two prongs of the *Pierce* test, this Court cannot find that the third prong has been satisfied." PCRA Ct. Op. at 44.[25] The court opined that

25. While the PCRA court ultimately denied relief due to lack of prejudice, it found not particularly credible Appellant's family members' testimony that they would have testified at Appellant's trial, finding that trial counsel attempted to contact a number of those witnesses to no avail. *Id.* at 41. *See also supra* at 41 (outlining trial counsel's testimony in that regard). The PCRA court referenced trial counsel's statement to the jury during closing argument in the penalty phase, emphasizing that counsel would have presented more testimony from family

"[d]espite the voluminous amount of depositions, exhibits, and testimony presented during the PCRA evidentiary hearing, this Court must conclude that the evidence presented was merely cumulative of evidence that was already offered to the jury during trial." *Id.* The PCRA court reasoned that because the jury believed the Commonwealth's theory that Appellant willfully starved her daughter to death, "it would be a stretch to conclude that an overwhelming amount of witness testimony, each testifying to nearly identical facts, would have somehow persuaded the jury that a sentence of life imprisonment would have been more appropriate." *Id.*

In support of its ruling, the PCRA court relied on this Court's decision in *Commonwealth v. Gibson*, 610 Pa. 332, 19 A.3d 512 (2011). In *Gibson*, the defendant had been convicted of two counts of first degree murder after he fired his gun into a crowded bar during a robbery, killing a police officer and a bystander. The issue on collateral review was whether the defendant suffered prejudice from trial counsel's failure to present mitigation evidence documenting the defendant's neglect and abuse as a child, his dependence on drugs and alcohol, and the fact that the defendant may have been intoxicated at the time of the murders. The defendant argued that such evidence would have demonstrated that the defendant was under the influence of extreme mental or emotional disturbance, 42 Pa.C.S. § 9711(e)(2), that his capacity to conform his conduct to the law's requirements was substantially impaired, id. § 9711(e)(3), and that the evidence would support the Section 9711(e)(8) mitigating circumstance relating to the character of the defendant and the circumstances of his of-

members, but none bothered to attend Appellant's trial. PCRA Ct. Op. at 41 (citing N.T., Nov. 9, 2000, at 996); *see also* n. 22, *supra* (referencing trial counsel's comments in that regard). Additionally, the PCRA court discounted the report conducted by mitigation specialist, Kathleen Kaib, and the report drafted by forensic psychiatrist Dr. Catherine Lewis. The PCRA court opined that both reports "consist primarily of information gleaned from many of the same family members called to testify at the PCRA hearing ten years after the ultimate determination of guilt had been rendered." PCRA Ct. Op. at 41. The PCRA court did not address specifically the remaining mental health mitigation evidence, including the report of Dr. Moran, which trial counsel had in his possession at the time of Appellant's trial.

fense. The PCRA court in *Gibson* granted the defendant a new penalty hearing, concluding that the defendant was prejudiced by trial counsel's failure to investigate and present the aforementioned evidence because there was a reasonable probability that, had such evidence been presented, at least one juror would have voted to impose a life sentence.

This Court in *Gibson* reversed the grant of a new penalty hearing on the grounds of lack of prejudice. We held that the new evidence of mitigation was not likely to have swayed a juror to alter his or her vote, considering the significant evidence of aggravating circumstances, such as the defendant's commission of multiple murders, the grave risk of death that the defendant's conduct imposed upon the other bar patrons, and the commission of the murders during the perpetration of a robbery. *Gibson*, 19 A.3d at 531.[26] Compared to such aggravating factors, we held that the life-history and mental health mitigation evidence was not compelling. Thus, this Court held that the PCRA court's conclusion that counsel's omissions resulted in prejudice could not be sustained.

The PCRA court in the instant case held that in light of our ruling in *Gibson*, and based on a thorough review of the record, it believed that "although trial counsel could have more thoroughly investigated and presented available mitigation evidence, it is unlikely that any juror would have altered their vote for the death penalty." PCRA Ct. Op. at 43.

The Commonwealth argues that the PCRA court's findings of facts are supported by the record and that its legal conclusions are free from error. It contends that trial counsel's performance during the penalty phase satisfied constitutional standards as he presented a stipulation that Appellant had no prior criminal convictions and that she adjusted well in prison, and incorporated Appellant's guilt phase testimony outlining her neglect and abuse as a child and abusive adult relation-

26. We further rejected the PCRA court's conclusion that the new evidence of mitigation satisfied the (e)(2) and (e)(3) mitigating circumstances because the defendant's use of drugs and alcohol at the time of the murders was largely voluntary, and the defendant's actions during the commission of the murders demonstrated that he appreciated the criminality of his conduct.

ships. The Commonwealth asserts that the record supports the PCRA court's finding that trial counsel made efforts to contact family members to corroborate Appellant's trial testimony in this regard, but was ultimately unsuccessful. It further maintains that the PCRA court rejected properly the testimony of Appellant's family members, who indicated that they were willing and able to testify on Appellant's behalf, even though none of them actually attended Appellant's highly publicized capital murder trial. The Commonwealth also reiterates the PCRA court's conclusion that the new evidence of mitigation relating to Appellant's difficult childhood and abusive adult relationships was cumulative of that presented by trial counsel.

Concerning the new evidence of mental health mitigation, the Commonwealth appears to concede that Appellant satisfied the arguable merit and lack of reasonable basis prongs of the ineffectiveness standard, and focuses its argument on the prejudice prong, finding that it is lacking here. It argues that this Court dealt with a similar claim in *Commonwealth v. Lesko*, 609 Pa. 128, 15 A.3d 345 (2011), where we reversed the grant of a new penalty hearing based on trial counsel's failure to present mental health mitigation evidence. In *Lesko*, the defendant and his cohort shot and killed a police officer after a lawful traffic stop, and were convicted of first degree murder. On collateral review, the PCRA court held that trial counsel was ineffective during the penalty phase of trial for failing to present the testimony of a neuropsychologist who opined that the defendant suffered from organic brain damage and additional mitigating evidence relating to the defendant's difficult upbringing. This Court reversed the grant of a new penalty hearing on the ground that the defendant did not demonstrate that he was prejudiced by trial counsel's omissions.

We held that the defendant in *Lesko* did not establish that the sentencing proceeding was rendered unreliable by trial counsel's omissions, considering that the aggravating circumstances were so patently grave, including that defendant had been convicted of two prior murders (satisfying both the aggravating circumstance of a significant history of violent

felony convictions under Section 9711(d)(9) and the Section 9711(d)(10) multiple murder aggravator), and that the defendant killed a police officer (satisfying the Section 9711(d)(1) aggravator). We acknowledged that while trial counsel did not present the testimony of a psychiatrist, he presented to the jury the testimony of a psychologist who had diagnosed Lesko with polysubstance abuse and a borderline personality disorder resulting in extremely erratic and explosive behavior, which led the jury to find the mitigating circumstance that the defendant was under the influence of extreme emotional or mental disturbance, 42 Pa.C.S. § 9711(e)(2). Trial counsel had also presented evidence of the defendant's social history through the testimony of a social worker who, based on interviews of the defendant and his family, described Appellant's past as involving a pattern of neglect, physical abuse and sexual abuse, which led the jury to find the catchall mitigating factor at Section 9711(e)(8). We concluded in *Lesko* that there was not a reasonable probability that a life sentence would have been returned if the mitigation evidence presented at trial had been supplemented by the mitigation evidence presented at the PCRA hearing.

The Commonwealth submits that this case is akin to *Lesko* in that no prejudice arose from trial counsel's failure to present additional evidence of Appellant's background and mental health mitigation evidence. It emphasizes that as a result of trial counsel's performance during the penalty phase, the jury found two mitigating circumstances relating to Appellant's lack of criminal history and the catchall mitigator. The Commonwealth concludes that considering the overwhelming evidence demonstrating the heinousness of Appellant's abuse and intentional starvation of her own child, it is not reasonably likely that one juror would have voted for life imprisonment had trial counsel introduced the mitigation evidence presented at the PCRA hearing.

■ Upon careful review, we cannot conclude that the record supports the PCRA court's denial of relief on Appellant's ineffective assistance of counsel claim. In *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000),

and *Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), the United States Supreme Court applied the *Strickland* ineffectiveness standard to claims that trial counsel were ineffective for failing to investigate and present mitigation evidence during the penalty phase of a capital trial. The High Court opined that capital counsel has an obligation to investigate thoroughly and prepare mental health and other mitigation evidence, *Williams,* at 396, 120 S.Ct. 1495; counsel cannot meet this requirement by relying on "only rudimentary knowledge of [the defendant's] history from a narrow set of sources." *Wiggins,* at 524, 123 S.Ct. 2527.

We hold that trial counsel's investigation into mitigation evidence fell below this constitutional standard, and that Appellant has satisfied the *Strickland* performance prong of the ineffectiveness test. *See Commonwealth v. Koehler,* 614 Pa. 159, 36 A.3d 121, 132 (2012) (recognizing that "[t]his Court has characterized the *Strickland* standard as tripartite, by dividing the performance element into two distinct parts," namely, that the underlying legal issue is of arguable merit, and that counsel's action lacked an objective reasonable basis).

■■■ Trial counsel's own testimony reveals that he conducted little, if any, investigation into mitigation evidence. Although trial counsel was indisputably aware of Appellant's claims that she suffered from child abuse and was a victim of domestic violence due to her disclosure of these facts at trial, trial counsel failed to identify a single person that he interviewed or a single document that he obtained to corroborate such claims. While trial counsel acknowledged interviewing Appellant's father and grandmother, he conceded that he did not question them about Appellant's upbringing or domestic abuse, and did not seek contact information of other family members who could have shed light on Appellant's circumstances. N.T., Apr. 26, 2010, at 51–54, 57. Trial counsel provided somewhat inconclusive testimony as to whether he actually contacted Appellant's family members and whether such family members refused to cooperate in his investigation. When asked directly whether there were relatives or friends

that were reluctant or who refused to testify on Appellant's behalf during the penalty proceeding, counsel responded,

> Let me put it to you this way. If they had been uncooperative to testify and they already provided me with information that was favorable to us, I would have subpoenaed them and put them on the stand. My recollection is that we put on everybody we could find to attempt to put them on the stand.

*Id.* at 94.[27]

▆ The record demonstrates, however, that trial counsel did not present any witnesses during the penalty phase, but rather relied, in large part, on Appellant's own testimony of her abuse and domestic violence that she gave during the guilt phase of trial, and entered a stipulation that Appellant had no criminal convictions. Keeping in mind the well-established presumption that trial counsel is deemed effective, and that "judicial scrutiny of counsel's performance must be highly deferential," *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052, we are nevertheless compelled to conclude that trial counsel's strategy was unreasonable. *See Lesko,* 15 A.3d at 380 (holding that where matters of strategy are concerned, counsel's assistance is deemed constitutionally effective if counsel chose a particular course of action that had some reasonable basis designed to effectuate his client's interests).

27. We acknowledge that the PCRA court found not particularly credible Appellant's family members' testimony that they would have testified at Appellant's trial, and further found that trial counsel attempted unsuccessfully to contact a number of those witnesses. PCRA Ct. Op. at 41. When reviewing trial counsel's testimony in its entirety, however, we conclude that the record does not support a finding that Appellant's family refused to cooperate in trial counsel's investigation. Trial counsel's comment during his closing argument of the guilt phase, that no family members appeared at trial to support Appellant, N.T., Nov. 9, 2000, at 996, does not establish, as a matter of fact, that trial counsel contacted each individual to offer mitigating evidence, and that each person refused to comply. We emphasize that the trial court did not find expressly that Appellant's performance during the penalty phase was reasonable. Instead, the PCRA court opined that Appellant "likely satisfies the first two prongs of the *Pierce* test," PCRA Ct. Op. at 44, and proceeded to deny relief based on a lack of prejudice.

We reach this conclusion based on the consideration that trial counsel also acknowledged that he possessed Appellant's pretrial competency report drafted by Dr. Moran, which indicated that Appellant had a borderline range of intellectual functioning, was markedly impaired in her ability to employ common sense or logical analysis, and that she suffered from schizoaffective disorder, adjustment disorder with anxiety, depressive personality disorder, and passive-aggressive personality disorder. PCRA Exhibit 75. Trial counsel admitted that he possessed Dr. Moran's report prior to trial and that such report contained admissible mitigation evidence, yet offered no strategic reason for failing to investigate further mental health mitigation evidence. *See* N.T., Apr. 26, 2010, at 92 (where trial counsel states, "As I recall the report, [Appellant's] mental capabilities or functioning was borderline, all of which would have been admissible mitigation. I can't tell you why I didn't call [Dr. Moran]."). Accordingly, we conclude that trial counsel's performance during the penalty phase of trial was not based upon a reasonable strategy, but rather resulted from an inattention to mitigation evidence that was readily available.

Our inquiry is not complete, however, because even if trial counsel's investigation is deemed unreasonable, a defendant is not entitled to relief unless he demonstrates that he was prejudiced by counsel's omissions. *Commonwealth v. Collins*, 585 Pa. 45, 888 A.2d 564, 580 (2005). It is the prejudice prong of the ineffectiveness test upon which the PCRA court and the Commonwealth most rely. To demonstrate prejudice from trial counsel's failure to investigate and present mitigating evidence, the defendant must establish that "it is probable that at least one juror would have accepted at least one mitigating circumstance and found that it outweighed the aggravating circumstance found." *Commonwealth v. Ligons*, 601 Pa. 103, 971 A.2d 1125, 1150 (2009). "Such reweighing, of course, is not an exact science, as a reviewing court cannot know with certainty exactly how twelve jurors would have reacted to testimony that they never heard. Nevertheless, we can evaluate the relative strength of the

aggravation and mitigation, as well as the parties' arguments in light of the full record." *Commonwealth v. Gibson,* 19 A.3d at 530.

Both the PCRA court and the Commonwealth opined that Appellant was not prejudiced by trial counsel's failure to present the proffered mitigation evidence because it would not have persuaded a single juror to change his or her vote from death to life imprisonment. As explained *supra,* the conclusions of the PCRA court and the Commonwealth rest on two grounds—that the new evidence of mitigation was merely cumulative of evidence already presented during the penalty phase of Appellant's trial, and that the overwhelming evidence that Appellant starved her daughter to death would have outweighed any evidence of mitigation. As noted, the PCRA court relied on this Court's previous decision in *Gibson* in making its determination of no prejudice, and the Commonwealth relies on this Court's decision in *Lesko.*

We disagree, although our analysis is somewhat nuanced. The record demonstrates that the new evidence of mitigation presented during the PCRA proceedings was not merely cumulative of that set forth at Appellant's trial. Addressing first the evidence of Appellant's abuse, both as a child and in adult relationships, we believe that the new evidence presented at the PCRA hearing would have been far more persuasive than that presented at the penalty phase of trial. The new evidence characterized Appellant's life as having been plagued by the abandonment by her mother, neglect by her drug-dealing father, abuse by her step-mother, and included documentary evidence corroborating Appellant's claims that she had been the victim of domestic violence at the hands of her previous boyfriends.

It cannot be ignored, however, that, based on Appellant's trial testimony, the jury found the catchall mitigating circumstance relating to the character of the defendant and the circumstances of the offense. Thus, Appellant cannot establish that she was prejudiced by trial counsel's failure to present additional mitigating evidence of Appellant's childhood

abuse and domestic violence. *See Commonwealth v. Rios*, 591 Pa. 583, 920 A.2d 790, 812–813 (2007) (holding that because the jury found both mitigators advanced by the defendant, trial counsel's failure to offer any additional evidence concerning those mitigators could not be prejudicial) (citing *Commonwealth v. Marshall*, 571 Pa. 289, 812 A.2d 539 (2002), for the proposition that "appellant fails to establish prejudice in connection with an ineffectiveness claim based on counsel's failure to investigate and present additional evidence in support of a finding of a mitigating circumstance when that mitigating circumstance was already found to exist without the benefit of the additional evidence.").[28]

■ However, the new evidence of mitigation presented at the PCRA hearing that related to Appellant's mental health supported two additional mitigating circumstances for which the defense did not present any evidence at trial—that Appellant was under the influence of extreme mental and emotional disturbance pursuant to Section 9711(e)(2), and that her capacity to conform her conduct to the requirements of law was substantially impaired pursuant to Section 9711(e)(3). As noted, Appellant demonstrated that at the time of trial, counsel was in possession of a pretrial competency report drafted by Dr. Moran, which indicated that Appellant had only borderline intellectual functioning, and suffered from several mental impairments. As illustrated in detail, *supra*, Appellant presented at the PCRA evidentiary hearing testimony from additional mental health experts who had reviewed Appellant's background and the extent of her criminal behavior and opined that at the time of the murder, Appellant was under the influence of extreme mental and emotional disturbance

28. In the responsive opinions, a majority of the Court rejects this Court's holdings in *Rios* and *Marshall, i.e.,* that counsel cannot be deemed ineffective for failing to present additional catchall mitigating evidence where the jury found the catchall mitigator based on other evidence presented by counsel during the penalty hearing. While this author agrees that these concerns are thoughtful, neither party requests that this Court reconsider our holdings in *Rios* or *Marshall*, and I would decline to do so under the facts presented absent advocacy of the parties.

and her capacity to conform her conduct to the requirements of the law was substantially impaired.

We cannot say that had such mental health mitigating evidence been presented, the jury would still have arrived at a death verdict. *See Commonwealth v. Keaton*, 615 Pa. 675, 45 A.3d 1050, 1093 (2012) (holding that trial counsel was ineffective for failing to investigate and present evidence of neurological impairment and psychological disorders because such evidence would have supported the (e)(2), (e)(3) and (e)(8) mitigators, and there is a reasonable probability that at least one juror may have struck a different balance had such evidence been presented); *Commonwealth v. Martin*, 607 Pa. 165, 5 A.3d 177, 203–04 (2010) (holding that trial counsel was ineffective for failing to present during the penalty phase available mental health mitigation evidence supporting two additional statutory mitigators not proffered by the defense); *Commonwealth v. Zook*, 585 Pa. 11, 887 A.2d 1218, 1235 (2005) (holding that the defendant was prejudiced by trial counsel's failed to present available evidence of defendant's head injury and resulting brain damage that were available at the time of trial to establish two additional mitigating factors that were not presented during the penalty phase).

Finally, contrary to the PCRA court's and the Commonwealth's contentions, this case is distinguishable from our previous decisions in *Gibson* and *Lesko*, where we held that no prejudice resulted from trial counsel's failure to present mitigation evidence due to the significant amount of aggravating evidence presented. In relying on *Gibson* and *Lesko*, both the PCRA court and the Commonwealth appear to conflate the evidence of Appellant's guilt, which is overwhelming, with the evidence of statutory aggravating circumstances presented during the penalty phase, which consists of a single, albeit weighty, aggravating factor of the age of the victim.

In *Gibson*, the Commonwealth presented evidence of and the jury found the statutory aggravating circumstances of multiple murders, 42 Pa.C.S. § 9711(d)(11), creating a grave risk to others, *id.* § 9711(d)(7), and commission of the murders during the perpetration of a felony, *id.* § 9711(d)(6).

Likewise, in *Lesko*, the Commonwealth presented evidence of and the jury found the statutory aggravating circumstances of multiple murders, a significant history of violent felony convictions, *id.* § 9711(d)(9), and the killing of a police officer. *Id.* § 9711(d)(1). Here, as noted, the single aggravating factor presented to the jury by stipulation was that the victim was a child under the age of twelve. *Id.* § 9711(d)(16). While this single aggravating circumstance is undoubtedly grave, we cannot conclude that it equates with the overwhelming evidence of statutory aggravating factors found by the juries in *Gibson* and *Lesko*. *See Commonwealth v. Malloy*, 856 A.2d at 789 (holding that the defendant was prejudiced by trial counsel's failure to present mitigating evidence, and emphasizing that the Commonwealth pursued a single aggravating circumstance). In assessing prejudice, that single aggravating circumstance must be contrasted with the two mitigating circumstances actually presented as well as the mitigating circumstances that trial counsel should have pursued. Under the circumstances presented, we conclude that there is a reasonable probability that at least one juror at Appellant's trial may have struck a different balance had such mental health mitigation evidence been presented.

Having concluded that Appellant is entitled to a new penalty hearing on her claim that trial counsel was ineffective for failing to present mental health mitigation, we need not address her remaining claims relating to the penalty phase of trial. Accordingly, for the reasons set forth herein, the order of the PCRA court is affirmed in part and reversed in part, and the matter is remanded for a new penalty phase hearing. Jurisdiction relinquished.

Justice BAER delivers the opinion of the Court with respect to all issues, except for the reference to a principle pertaining to catch-all mitigation evidence, as discussed in the concurrences of Chief Justice CASTILLE and Justices SAYLOR and EAKIN.

Justice McCAFFERY joins the opinion.

Chief Justice CASTILLE files a concurring opinion in which Justice EAKIN joins.

Justice SAYLOR files a concurring opinion in which Justice EAKIN and Justice TODD join.

Justice EAKIN files a concurring opinion.

Justice STEVENS files a concurring and dissenting opinion.

Chief Justice CASTILLE, concurring.

██ I join Mr. Justice Baer's Opinion, with a single caveat concerning the point addressed by Mr. Justice Saylor in his Concurring Opinion.

Consistently with our precedent, Justice Baer's lead Opinion[1] expresses the view that because the jury found the catchall mitigator at 42 Pa.C.S. § 9711(e)(8), in response to evidence of appellant's character and the circumstances of the offense, no prejudice can be shown from counsel's failure to present alleged additional catchall evidence of appellant's personal history—both past and ongoing—as a victim of neglect, abandonment, abuse, and even violence. Majority Op. at 732–35, 101 A.3d at 772–73.

Renewing the position that Justice Saylor set forth at greater length in his concurring and dissenting opinion in *Commonwealth v. Rios*, 591 Pa. 583, 920 A.2d 790 (2007), Justice Saylor argues that the lead opinion's approach, which is grounded in the Court majority's decision in *Rios* and the unanimous opinion in *Commonwealth v. Marshall*, 571 Pa. 289, 812 A.2d 539 (2002), is both illogical and unfair. Justice Saylor notes that the assessment of aggravating and mitigating circumstances is qualitative, and the categorical approach approved in *Rios* is not prescribed by the death penalty statute nor any of our other case precedent. Justice Saylor explains that the *Rios* approach can too easily erode penalty phase review into a mechanical process divorced from the jury's serious and weighty work of weighing aggravators and

1. Given the four Justices in concurrence, as to this one point, Justice Baer's opinion represents a minority view; as to all other points, it is a majority expression.

mitigators in the capital case context. Taken too far, Justice Saylor aptly notes, an instance of truly ineffective assistance of counsel could be improperly excused.

Justice Baer responds that Justice Saylor's concerns, while reasonable, are not before us with the requisite level of advocacy by the parties to warrant revisiting *Marshall* and *Rios*. I joined the Court majority in both *Rios* and *Marshall*, and agree generally that it is not the policy of this Court to reconsider our precedent on a *sua sponte* basis. Nevertheless, instances may arise when to do so can be appropriate and beneficial to advancing the law. *See Commonwealth v. Mitchell*, 588 Pa. 19, 902 A.2d 430, 474–75 (2006) (Castille, J., concurring and dissenting) (citations omitted) ("One also does not have to search very far to find cases where this Court has *sua sponte* reconsidered and overruled prior precedent, including very recent precedent. In many of these very cases, moreover, statutory interpretation was involved and we acted despite the absence of intervening corrective action by the Pennsylvania General Assembly. There are a myriad of other circumstances where individual Justices have taken it upon themselves to suggest a need for a closer look at precedent, and particularly in capital case jurisprudence. The indisputable point, as I see it, is that there is no absolute jurisprudential bar against what I propose; indeed, there is ample precedent in favor of it. Moreover, as I have noted in another context, since the affected party [may be reluctant] to be so bold as to squarely ask for reconsideration of apparently-controlling precedent, it oftentimes falls upon this Court, or individual Justices, to notice the issue.").

I believe this case presents just such a circumstance and that, upon further reflection, Justice Saylor is correct that the evaluation must be qualitative, particularly when the catchall mitigator is at issue. If specific additional evidence relevant to the catchall mitigator is not presented to a penalty phase jury, but is ultimately shown to have been available, material, and weighty, to the point where there is a reasonable probability that one juror may well have decided against imposition of the death penalty, *see Commonwealth v. Malloy*, 579 Pa. 425,

856 A.2d 767, 789 (2004), counsel was ineffective. As an aside, I would merely note that a reorientation toward qualitative assessments in death penalty cases may require reconsideration of other precedents where the Court has adopted categorical approaches, and especially in cases where the *per se* rule so adopted is unsupported by a reasoned analysis. *See, e.g., Commonwealth v. Padilla,* 80 A.3d 1238, 1286–88 (Pa.2013) (Castille, C.J., concurring, joined by Eakin, J.) (criticizing *Commonwealth v. Williams,* 539 Pa. 61, 650 A.2d 420 (1994), where Court, without supported reasoning, declared that when an aggravating circumstance is struck down in a case where the jury found multiple aggravators and at least one mitigator, Court cannot assess prejudice and award of new penalty hearing is required).

Justice Baer's now-minority view respecting this single point of law is ultimately of no consequence since the Court grants relief upon a related, but legally distinct, penalty phase claim. Since four Justices in concurrence agree with a qualitative approach to claims resting upon additional evidence supporting a found-mitigator, however—a position which overrules *Marshall* and *Rios*—I believe there is some benefit in exploring this now-majority viewpoint in operation. A qualitative approach here begins with what the jury did have before it from the penalty phase: the stipulation that appellant had no prior criminal record and incorporation of the guilt phase evidence, which included appellant's testimony in her own defense that she had been a victim of physical and emotional abuse at the hands of her own parents, step-parents, and boyfriends, including the fathers of her children, who gave her no support in raising their children. *See* Majority Op. at 686–87, 101 A.3d at 744. At the PCRA hearing, though, appellant asserted that counsel could have: (1) called numerous family members to corroborate her testimony; (2) obtained her school records, which showed consistently below-average intelligence and performance; (3) obtained her father's criminal records, which included various DUI and drug dealing offenses; (4) corroborated appellant's testimony of domestic abuse by her boyfriends by obtaining and presenting police

records available for such incidents; and (5) presented testimony of prison guards of appellant's exemplary behavior while incarcerated. *Id.* at 44–45.

Had appellant *not* taken the stand in her own defense during the guilt phase and testified as to the history of abuse and neglect she suffered at the hands of her own family and boyfriends, there is little doubt that her catchall mitigator "bundle" would have been much thinner, by any accounting. But appellant did testify as to these complicated misfortunes in her life; and although testimony by family members or presentation of records would have been corroborative, and perhaps bolstered the credibility of appellant's testimony in this regard, it would nevertheless have been cumulative of her own story in her own words, rather than factually distinctive with regard to the catchall mitigator. According to this qualitative rather than quantitative approach, I do not discount the possibility that one or more jurors may have given the catchall mitigator more weight, or that more jurors may have found the catchall mitigator (if the jury was less than unanimous in this regard). But this is not to say that an enhanced finding of the catchall mitigator would have altered the outcome, and ultimately I would conclude that there is not a reasonable probability that presentation of appellant's additional catchall mitigation evidence would have led at least one original juror to have voted against imposing the death penalty.

Justice Eakin joins this concurring opinion.

Justice SAYLOR, concurring.

I join the majority opinion, save for its perpetuation of the notion that, in any capital case in which one or more sentencing jurors find the catch-all mitigator present, counsel cannot be deemed ineffective for failing to present additional catch-all mitigating evidence. *See* Majority Opinion at 732–35, 101 A.3d at 772–73 (citing *Commonwealth v. Rios,* 591 Pa. 583, 621–22, 920 A.2d 790, 812–13 (2007), and *Commonwealth v. Marshall,* 571 Pa. 289, 304–05, 812 A.2d 539, 548–49 (2002)). So far as I

can tell, this approach derives from the conception that the weighing of mitigating circumstances is a mere counting exercise, a proposition which is neither supported by the death-penalty statute nor other decisions of this Court. *See, e.g., Commonwealth v. Spotz,* 610 Pa. 17, 99–100, 18 A.3d 244, 292–93 (2011) (crediting jury instructions admonishing that, "[i]n deciding whether aggravated [sic] outweigh mitigating circumstances, do not simply count their number[;] [c]ompare the seriousness and importance of the aggravating with the mitigating [circumstances].").

Illustrations of the patent illogic and unfairness of the approach may be readily envisioned. For example, the rule would operate to insulate a capital penalty lawyer's stewardship from rational scrutiny where the attorney has failed to present readily available and potentially weighty evidence that his client suffers from profound intellectual disability, *see generally Williams v. Taylor,* 529 U.S. 362, 398, 120 S.Ct. 1495, 1515, 146 L.Ed.2d 389 (2000) (commenting that "the reality that [the defendant] was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability"), where the lawyer nevertheless adduced evidence, credited as mitigating by a single juror albeit given little weight, that the defendant in his early youth had effectuated a single, modest act of volunteerism.

I have previously posited that the derivation of this rule lacks a principled underpinning, *see Rios,* 591 Pa. at 647, 920 A.2d at 828 (Saylor, J., concurring and dissenting), and I have difficulty appreciating why majority decisions continue to apply it in a rote fashion, with no attempt to address its obvious shortcomings.

Justice EAKIN and Justice TODD join this concurring opinion.

Justice EAKIN, concurring.

I join the concurring opinions of Chief Justice Castille and Justice Saylor. The rationale of *Commonwealth v. Marshall,* 571 Pa. 289, 812 A.2d 539 (2002), and *Commonwealth v. Rios,*

591 Pa. 583, 920 A.2d 790 (2007), can only apply if the jury found the mitigating factors presented outweighed the aggravating factors—additional mitigation evidence would amount to surplusage and would not have altered the result. If, however, the jury found the mitigation evidence presented did not outweigh the aggravating factors, counsel could be deemed ineffective for not presenting additional, available mitigation evidence, if such evidence is substantial enough to create a reasonable probability one juror may have voted against the imposition of death. Under this qualitative approach, which has now been adopted by a majority of this Court, *see* Concurring Op., at 738–41, 101 A.3d at 776 (Castille, C.J.), it is necessary to view the mitigation evidence not presented and determine if it could be substantial enough to tip the scale in the defendant's favor.

Here, given the significant unpresented mitigation evidence readily available to appellant's trial counsel, *see* Majority Op., at 722–25, 101 A.3d at 766–67, the scale could indeed tip. We cannot discount a potential ineffectiveness claim merely because the jury found the catch-all mitigator present. Since *Rios,* I have come to agree with Justice Saylor that the death penalty statute does not support merely evaluating the catch-all mitigation evidence quantitatively on collateral review. Prejudice may be found when there is a substantial difference between the nature or quality of evidence presented at trial and the evidence which the PCRA record shows was available but not investigated or presented, even if it is categorized as part of the same "factor." *See Rios,* at 828 (Saylor, J., concurring and dissenting) ("I fully support the notion that a failure on the part of trial counsel to adduce redundant evidence concerning a found mitigator will not satisfy [the] burden to prove prejudice. I have difficulty F with transporting this logic to bar claims that are based on substantial differences between the weight or type of the evidence that was presented at trial and that which is presented at the post-conviction stage." (citation omitted)); *see also Commonwealth v. Scott,* 561 Pa. 617, 752 A.2d 871, 877 n. 7 (2000) (opining defendant not prejudiced where counsel did not introduce drug-treatment records but presented testimony of forensic

psychologist and defendant's father regarding defendant's past drug treatment).

Justice STEVENS, concurring and dissenting.

I agree with the majority's conclusion that the PCRA court properly denied relief on Appellant's guilt phase claims. I respectfully dissent, however, from the majority's conclusion that Appellant is entitled to a new penalty hearing based on a claim that her trial counsel rendered ineffective assistance in failing to investigate and present mitigating evidence of Appellant's mental health.

Counsel is presumed effective, and to rebut that presumption, Appellant was required to demonstrate (1) the underlying legal issue has arguable merit; (2) counsel's actions lacked an objective reasonable basis; and (3) Appellant was prejudiced by counsel's act or omission. *Strickland v. Washington,* 466 U.S. 668, 687–91, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Commonwealth v. Koehler,* 614 Pa. 159, 178–79, 36 A.3d 121, 132 (2012).[1]

> To establish prejudice in a case involving the failure to investigate and present mitigating evidence, we must consider not only the evidence and argument presented at the penalty phase, but also the evidence and argument that would have been presented at the penalty hearing had trial counsel properly investigated such evidence. Prejudice is demonstrated when it is probable that at least one juror would have accepted at least one mitigating circumstance and found that it outweighed the aggravating circumstance found.

*Commonwealth v. Ligons,* 601 Pa. 103, 145, 971 A.2d 1125, 1150 (2009) (citations omitted). Here, even if it is assumed that counsel did not properly investigate and present additional mitigating evidence of Appellant's mental health, I would find that it is not probable that at least one juror would have accepted any additional mitigating circumstances, or found

1. The failure to meet any of these three elements precludes relief. *Koehler,* 614 Pa. at 179, 36 A.3d at 132 (citing *Commonwealth v. Lesko,* 609 Pa. 128, 176, 15 A.3d 345, 374 (2011)).

that such mitigating circumstances outweighed the aggravating circumstance of the victim's age.

The jurors deliberated the penalty phase of Appellant's trial the day after the guilt phase was concluded. The evidence presented during the guilt phase, thus fresh in the jurors' minds, was incorporated into the penalty phase.[2] N.T. 11/14/00 at 984. In addition to receiving specific instructions regarding aggravating and mitigating factors, the jury was instructed to "consider all of the evidence and arguments of both the Commonwealth and the defendant, including all of the evidence that you heard during the earlier trial and the statement that the defendant personally made to you when she addressed the jury during the original guilt phase of the trial." *Id.* at 997–1000, 1003.[3] Pursuant to these instructions, the jury found that the mitigating circumstances (that Appellant had no prior criminal history and had been abused and

**2.** Appellant did not object.

**3.** As this Court summarized in affirming Appellant's judgment of sentence on direct appeal, such evidence established that:

[A]ppellant possessed a willful, deliberate and premeditated intent to starve her daughter to death. Over a long period of time, [A]ppellant purposely denied Tausha proper nourishment and directed others to do the same. Appellant even went so far as to physically restrain Tausha so that the young girl would be unable to feed herself. Tausha was reduced to surreptitiously eating dog food, picking through the trash, and drinking out of the commode.

Moreover, [A]ppellant continued the deliberate mistreatment of her daughter despite obvious physical indications that Tausha was dangerously malnourished and comments from others that her daughter looked seriously ill. The fact that [A]ppellant was conscious of what she was doing was suggested by her own conduct and admissions. She avoided taking Tausha to the doctor and she removed Tausha when the CYS caseworker was scheduled to visit, thus ensuring that those who might have noticed Tausha's condition and taken steps to help her would be unable to do so. In addition, as noted above, [A]ppellant told Lisa Camp that Tausha "belonged six feet under and in a body bag," and, after her arrest, [A]ppellant stated to one of her prison cellmates: "I'm glad the little retarded baby is dead." N.T. 11/8/00 at 487. Appellant made a similarly disturbing comment to another cellmate, Dena Chandler, when Chandler asked [A]ppellant how she could kill her daughter. Appellant responded: "Easily. I never loved her. She interfered with my life." *Id.* at 508. The further fact that [A]ppellant dumped Tausha's body and concocted a false tale of kidnapping suggests consciousness of guilt.

*Commonwealth v. Tharp*, 574 Pa. 202, 216, 830 A.2d 519, 527 (2003).

neglected herself) did not outweigh the aggravating circumstance (the age of the victim). The particular circumstances of this case lead to the conclusion that not even a single juror would have rendered a punishment other than death, even if counsel had presented additional evidence of Appellant's mental health. Because Appellant has failed to show that she was prejudiced by counsel's representation, she is entitled to no relief.

Appellant's conviction and sentence withstood vigorous review during the direct appeal process. At the post-conviction stage the courts have again exhausted enormous effort to ensure that justice has been served.[4] Finding no error on the part of the PCRA court, I respectfully dissent from the majority's conclusion to the contrary.

---

4. Appellant's PCRA Petition, filed on her behalf by the Federal Community Defender Association, raised so many claims and involved such a volume of material as to cause the PCRA court to opine that counsels' intent was to delay Appellant's execution by delaying the PCRA proceedings. In deciding this matter, the PCRA court expressly noted that it had considered literally thousands of pages of exhibits, appendices, transcripts and briefs.